## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re: James Douglas Charity, Jr., and Regina Parker Charity, Debtors. | Case No. 16-31974-KLP Chapter 13 |

James Douglas Charity, Jr., and
Regina Parker Charity,
        Plaintiffs,

v.                                          A.P. No. 16-03121-KLP

NC Financial Solutions of Utah, LLC,
d/b/a NETCREDIT,
        Defendant.

---

| | |
|---|---|
| In re: Collin Edmonds and Bobbie Lane Edmonds, Debtors. | Case No. 16-32554-KRH Chapter 13 |

Collin Edmonds and
Bobbie Lane Edmonds,
        Plaintiffs,

v.                                          A.P. No. 16-03122-KLP

NC Financial Solutions of Utah, LLC,
d/b/a NETCREDIT,
        Defendant.

---

| | |
|---|---|
| In re: Mekeanna Shindrell Lane, Debtor. | Case No. 16-32672-KLP Chapter 13 |

Mekeanna Shindrell Lane,
        Plaintiff,
v.                                          A.P. No. 16-03150-KLP

NC Financial Solutions of Utah, LLC,
d/b/a NETCREDIT,
        Defendant.

## MEMORANDUM OPINION

These three adversary proceedings involve similar claims for damages resulting from willful violations of the automatic stay by NC Financial Solutions of Utah, LLC, d/b/a NetCredit ("NetCredit" or the "Defendant"). The individual plaintiffs (individually, the "Plaintiff" and jointly, the "Plaintiffs") are seeking actual damages pursuant to § 362(k)(1) of the Bankruptcy Code, 11 U.S.C. § 362(k)(1),[1] including compensatory damages, punitive damages, and attorneys' fees. The cases were tried consecutively on January 12, 2017. In all three cases, NetCredit admitted liability, and the issues at trial were limited to a determination of the appropriate amount of damages.

Prior to trial, a consent order was entered in each case granting a motion to bifurcate the claim for attorneys' fees from the other damage claims and providing that an award of attorneys' fees would be addressed pursuant to a subsequent motion process. At the conclusion of the trials, the Plaintiffs were instructed to submit their requests for attorneys' fees within twenty-one days, and the Defendant was allowed an additional fourteen days to respond. The Court also ordered NetCredit to submit financial information pertaining to its value within twenty-one days, allowing the Plaintiffs fourteen days thereafter to respond.

---

[1] All subsequent references to the Bankruptcy Code or references to single statutory sections are to 11 U.S.C. §§ 101-1532, unless otherwise noted.

In each adversary proceeding, on February 2, 2017, the Plaintiffs filed a "Consolidated Application by Counsel for Plaintiffs for Award of Attorney Fees and Reimbursement of Expenses" (the "Application"), to which NetCredit objected.  On that same date, NetCredit submitted the required financial information pertaining to its value and moved that the information be filed under seal.  The Plaintiffs objected to the motion to file the documents under seal.

A hearing on the Application and NetCredit's request to seal its financial information was held on March 1, 2017.  The Court denied NetCredit's motion to seal and took the Application under advisement.  Following the March 1 hearing, counsel for each of the three law firms collectively representing the Plaintiffs filed Disclosures of Compensation pursuant to section 329(a) of the Bankruptcy Code, and Bankruptcy Rule 2016(b), Fed. R. Bankr. P. 2016(b),[2] in each case.  On March 16, the Plaintiffs submitted supplemental, post-trial briefs on the "outstanding issues," and on March 30, NetCredit filed responsive briefs.  The matters are ripe for adjudication on all issues.

### Jurisdiction and Venue

The Court has subject matter over each of these adversary proceedings pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference from the U.S. District Court for the Eastern District of Virginia dated August

---

[2]. All subsequent references to the Bankruptcy Rules will be to Fed. R. Bankr. P. unless otherwise noted.

15, 1984.  These are core proceedings under 28 U.S.C. § 157(b)(2)(A) and (O)

in which final orders and judgments may be entered by a bankruptcy judge

subject to the right of appeal under 28 U.S.C. § 158.  Venue is proper in this

Court pursuant to 28 U.S.C. § 1408.

## Findings of Fact

These cases involve similar facts and common issues of law.

Nevertheless, each of the Plaintiffs is seeking discrete compensatory

damages.  In each case, the parties submitted joint stipulations of

uncontroverted facts that were supplemented by additional evidence in the

form of testimony and exhibits offered at trial.

### *Joint Stipulations Applicable to All Cases*

The following identical stipulations were submitted in each case:

The parties stipulate that NetCredit violated the automatic stay in 11
U.S.C. § 362 by contacting the [Debtor/Debtors] more than once and by
withdrawing money from the [Debtor's/Debtors'] bank account after
NetCredit received notice of the Debtor's/Debtors'] bankruptcy.
NetCredit had knowledge the automatic stay was in effect and failed to
stop its collection communications and ACH withdraws which had the
effect of violating the stay.

The parties further agree NetCredit reserves the right to argue that no
damages should be assessed for certain communications with the
[Debtor/Debtors] that NetCredit contends were not violations of the
automatic stay.  The parties agree the trial will be about damages to be
awarded, including whether to assess punitive damages.

### *Common Facts*

Before filing bankruptcy, Mekeanna Lane, Bobbie Edmonds, and

Regina Charity (jointly, the "Borrowers") each obtained an unsecured loan (in

principal amounts ranging from $2,100.00 to $4,020.00) from NetCredit and

signed a document entitled Consumer Installment Loan Agreement (the

"Agreement").[3]  The Agreement provided that the Borrowers would pay semi-

monthly installments of principal and interest to NetCredit.  The Agreement

also authorized NetCredit to receive payment by electronic funds transfer

from a bank account through the ACH network (the "ACH Authorization").[4]

Payments were automatically withdrawn when due.

At the time of their bankruptcy filings, each Borrower had an active

ACH Authorization in place.  In each case, NetCredit, after receiving notice of

the bankruptcy filing, continued to demand payment and continued to

withdraw funds from the Borrowers' bank accounts.[5]

### *Mekeanna Lane (Adv. Pro. No. 16-03150-KLP)*

#### Stipulated Evidence

The parties stipulated to the following:[6]

On April 21, 2016, Mekeanna Lane borrowed $2,100.00

from NetCredit and subsequently commenced paying NetCredit

by allowing it to electronically withdraw semimonthly payments

from her bank account.  On May 27, 2016, Ms. Lane filed a

Chapter 13 bankruptcy case.  NetCredit received the Notice of

---

[3] The material provisions contained in each of the loan documents at issue, aside from the loan and repayment amounts, and annual percentage rates, are the same if not identical.
[4] The Agreement provides that NetCredit obtains a "security interest in the ACH Authorizations."  It also states that the ACH Authorization is not required in order to enter into the loan transaction and, if implemented, may be terminated no later than three business days after receiving a termination request.
[5] Plaintiffs James and Regina Charity were not customers of a bank but rather of a credit union.  For simplicity, that credit union account is included in any reference to the Plaintiffs' "bank accounts."
[6] The stipulated facts are not a verbatim reproduction of the parties' stipulation filed with the Court but rather a summary of the relevant stipulated facts.

Bankruptcy from the Bankruptcy Notice [sic] Center on June 1, 2016.

On June 10, 2016, and again on June 24, 2016, NetCredit withdrew $83.94 from Ms. Lane's bank account.  On those same days, NetCredit sent emails to Ms. Lane thanking her for recent ACH payments.  On June 30, 2016, NetCredit sent an email to Ms. Lane acknowledging the cancellation of her ACH authorization.  The subject line on the June 30 email stated "Your Payment Authorization Has Been Revoked."  The email included the following language:

> Please understand that the cancellation of your electronic authorization does not relieve you of your obligation to repay your loan, and that all payments are still due on your scheduled installment dates.  Call our Customer Support Team . . . to set up arrangements for your next payment via check, debit/credit card, Western Union or Money Gram.
>
> Remember that we report payment activity to major credit bureaus, and making full and on-time payments toward your loan may help you build positive credit history.  Conversely, late payments could hurt your credit score or damage your credit health.

On June 28, 2016, Ms. Lane filed her adversary proceeding.  On June 30, NetCredit reversed the June 24 ACH debit and returned $83.94 to Ms. Lane.  On July 6, 2016, NetCredit sent an email to Ms. Lane stating that it had initiated a refund to her bank account "for the debit that occurred after

your bankruptcy filing." On July 22, 2016, NetCredit, through counsel, returned $83.94 to Ms. Lane for the June 10 ACH debit.

<u>Evidence Presented at Trial</u>

Ms. Lane filed bankruptcy because she was behind on her mortgage payments, credit cards and automobile payments and, despite working overtime, was unable to catch up. The income from her employment is the sole source of funds to support herself and her nine year old son. She filed under chapter 13 in order to consolidate her debts into a single, more manageable payment and ultimately obtain a discharge.

Sometime after filing her petition, Ms. Lane accessed her bank account electronically and learned that a payment had been withdrawn by NetCredit. This worried and confused her because she understood that the debits from her bank account would cease when she filed bankruptcy. In order to replace the funds and cover outstanding checks, she borrowed money from her mother.

A second postpetition debit by NetCredit required Ms. Lane to again borrow money from her mother. Although her mother has not asked for repayment, borrowing from her mother embarrassed Ms. Lane and made her feel like a burden, as she knew that her mother had limited resources. She worried that something might be wrong with her bankruptcy case. She was upset and angry.

Ms. Lane testified that she had to sign up for overtime to increase her income, requiring her to work extra hours. Because of this, she spent less

time with her son.  Ms. Lane makes $28.92 per hour.  She missed seven hours
of work in order to appear at the trial.

NetCredit's sole live witness was Joseph Banks, the Bankruptcy
Manager for an entity known as Enova International, Inc. ("Enova").
NetCredit is an online lender that is wholly owned by Enova.  Enova also
owns at least three other subsidiaries,[7] including an entity known as
CashNetUSA, a United Kingdom entity (the "UK entity"), and a "business
unit" known as Headway.  Measuring by volume of loans to customers,
NetCredit is smaller than CashNetUSA and the UK entity, although Mr.
Banks testified that "its volume kind of exploded in the last couple of years."
As the bankruptcy manager for Enova, Mr. Banks is responsible for
delegating and overseeing tasks, making personnel decisions, managing his
team to ensure that each are properly performing his or her duties,
conducting quality assurance tasks, conducting planning related to
bankruptcy business practices, and resolving "escalated" customer
complaints.

As bankruptcy manager, Mr. Banks supervises a team of four Enova
employees.  Each individual is solely responsible for bankruptcy-related
duties for one of the four Enova subsidiaries specified by Mr. Banks.  One of

---

[7] At trial, when questioned as to the subsidiaries of Enova, Mr. Banks testified as follows:
    THE COURT: And how many different subsidiaries does it have?
    THE WITNESS: It's up there. So, strictly for bankruptcy, I manage
    our CashNetUSA entity, our UK entity, NETCREDIT, and -- yeah,
    those three, including -- yeah, and then one more: our business unit,
    where we do business --Headway. So, it's four.
Tr. 109:18-24.

these individuals is solely responsible for managing all the NetCredit

accounts of customers who have filed bankruptcy.  At the time of Ms. Lane's

filing, the individual assigned to handle all of NetCredit's bankruptcy related

duties was Dansler Dover.

Mr. Banks testified that NetCredit has tens of thousands, possibly

hundreds of thousands, of customers.  He estimated that close to ten

thousand of those customers have filed bankruptcy.  Mr. Dover was assigned

all responsibilities relating to these customers, including the processing of

bankruptcy notices and the preparation and filing of proofs of claim.  In

addition, Mr. Dover was tasked with taking phone calls from customers in

bankruptcy, which Mr. Banks estimated to average 20 calls a day.

NetCredit's bankruptcy representatives utilize and are primarily

guided by a computer-based application known as a "Wiki."  Mr. Banks

described the Wiki as "a website where our representatives or our employees

can search for information . . . . [I]t has our business practices, policies and

procedures.  And the bankruptcy best practices are held . . . on our Wiki."[8]

Mr. Dover, as the designated person to manage bankruptcies for NetCredit,

was instructed to follow the "business practices" and "process" as set forth on

the Wiki.[9]

When a representative is informed that a customer has filed

bankruptcy, Enova's standard practice requires that a bankruptcy case be

---

[8] Tr. 57:21.  Unless otherwise noted herein, all transcript references are to the transcript of
the trial held January 12, 2017, and docketed in each adversary proceeding.
[9] Tr. 60:21-25.

"opened" by accessing the Wiki and entering the relevant information on the customer's account.[10]  This process is intended to ensure that no further collection action takes place, and if postpetition ACH withdrawals have already occurred, ensures that refunds to the customers are initiated.[11]

According to Mr. Banks, the postpetition collection action that took place in Ms. Lane's case occurred because Mr. Dover did not access and follow the correct process on the Wiki.  He did not open a bankruptcy case and did not terminate the ACH Authorization.[12]  Mr. Dover's employment was terminated, and the funds improperly debited from Ms. Lane's account were returned to her.

Mr. Banks stated that after discovering Mr. Dover's mistakes, a quality assurance check was initiated.  He did not, however, identify any changes in NetCredit's business practices resulting from the quality assurance check.  Aside from the opening of a bankruptcy case on the Wiki and a return of the postpetition withdrawals to Ms. Lane, no remedial action was taken.

NetCredit relies upon the efficacy of its automated system, the Wiki, and the adherence by its employees to its use in order to comply with bankruptcy-related requirements.  The Wiki generates automated standard form emails to customers in response to certain prompts.[13]  An email similar

---

[10] Tr. 58:13-24.
[11] Tr. 58-59.
[12] Tr. 61:2-6.
[13] Tr. 61:12-19.

to the "Your Payment Authorization Has Been Revoked" email sent to Ms. Lane (stating that "cancellation of your electronic authorization does not relieve you of your obligation to repay your loan, and . . . all payments are still due on your scheduled installment dates") is automatically generated and routinely sent to customers whose ACH Authorization has been revoked, even if the ACH Authorization was revoked because the customer has filed bankruptcy.[14]  Mr. Banks believes that the purpose of this email is not to collect a debt and that if he were in bankruptcy he would not think that this email was an attempt to collect a debt.  He does not think the words of the email show an attempt to collect a debt.[15]  NetCredit has not changed the text of this form email and intends to use it whenever an ACH is cancelled for a client who has declared bankruptcy.[16]

### *James and Regina Charity (Adv. Pro. No. 16-03121-KLP)*

#### Stipulated Evidence

The parties stipulated to the following:[17]

On March 19, 2015, Regina Charity borrowed $4,020.00 from NetCredit and subsequently commenced repaying NetCredit by allowing it to withdraw semimonthly payments

---

[14] Tr. 62:11-25; 63:1.

[15] Tr. 66:20.

[16] Tr. 66:21-25.  Mr. Banks testified that changing the text of the email is a "technology process . . . an exhaustive process.  It would take drafting a new email, it would take our dev (sic) team to initiate the new email, it would take dev work to initiate the process to review the automations.  So, it – it would take a process."  When asked if NetCredit had started the process, Mr. Banks replied "no."  Tr. 67:7-8.

[17] The stipulated facts are not a verbatim reproduction of the parties' stipulation filed with the Court but rather a summary of the relevant stipulated facts.

electronically from her credit union account.  On April 20, 2016, James and Regina Charity filed a joint Chapter 13 bankruptcy case.  NetCredit received the Notice of Bankruptcy Filing from the Bankruptcy Notice [sic] Center on April 22, 2016.

On April 25, 2016, NetCredit sent an email with the subject line "Friendly Reminder regarding your NetCredit account" to Mrs. Charity.  The email notified Mrs. Charity that her account was past due and that she should make a payment.

On April 29, May 2, May 13, and May 16, 2016, NetCredit sent emails to Mrs. Charity thanking her for her recent payments.  On May 18, 2016, NetCredit sent another "Friendly Reminder" email to Mrs. Charity advising her that her account was past due.

On May 18, 2016, NetCredit sent an email with the subject line "Bankruptcy Documentation Received" to Mrs. Charity.  The email stated that NetCredit had received documentation related to Mrs. Charity's bankruptcy filing and that notification had been routed to its bankruptcy department. It also stated that "[o]nce we have confirmed your bankruptcy filing status, we will ensure that no further collections efforts will be made on your account."

On May 21, 2016, NetCredit sent an email to Mrs. Charity stating that "per her request" it had canceled her ACH

Authorization.   This   communication   included   the   following language:

> Please understand that the cancellation of your electronic authorization does not relieve you of your obligation to repay your loan, and that all payments are still due on your scheduled installment dates.   Call our Customer Support Team . . . to set up arrangements for your next payment via check, debit/credit card, Western Union or Money Gram.

> Remember that we report payment activity to major credit bureaus, and making full and on-time payments toward your loan may help you build positive credit history.  Conversely, late payments could hurt your credit score or damage your credit health.

Between April 22 and May 18, 2016, NetCredit's records reflect that it made nine telephone calls to the Charity's home phone number, nine calls to another phone number for Mrs. Charity, and nine calls to Surry County High School, Mrs. Charity's employer.[18]  The call records indicate that most calls were not answered, and on most occasions no messages were left.  NetCredit's records also indicate that during the last call, placed on May 18, Mrs. Charity spoke with a representative and informed NetCredit of her bankruptcy.

---

[18] Mrs. Charity testified that phone calls from NetCredit to her place of employment were directed to the school office and, in some instances the calls would come to her in her classroom, which embarrassed her in front of her coworkers.  On cross examination, however, Mrs. Charity admitted that any NetCredit calls to her classroom had been received before her bankruptcy filing, as she had retired on July 1, 2015, and was no longer working at Surry County High School at the time of her filing.  NetCredit's call log indicates that no messages were left in connection with the calls to Surry County High School after the bankruptcy filing.

On April 29 and again on May 2, 2016, NetCredit withdrew $175.22 from Ms. Charity's credit union account through an authorized and regularly scheduled ACH debit. On May 13 and again on May 16, 2016, the credit union charged a $30.00 overdraft fee. The credit union also charged a stop-payment fee of $25.00 on May 18, 2016.

On July 1, 2016, NetCredit was served with the Complaint in this Adversary Proceeding. On July 22, 2016, NetCredit, through its counsel, returned $350.44, representing the post-petition credit union account withdrawals, to Mr. and Mrs. Charity.

<u>Evidence Presented at Trial</u>

Mr. and Mrs. Charity filed bankruptcy because Mr. Charity was out of work due to injury and the couple was behind on their bills. They had been receiving calls from bill collectors and were facing a foreclosure on their home. The bankruptcy was intended to provide relief from creditors' calls, stop the foreclosure, and enable them to pay their debts through the Chapter 13 trustee.

Mrs. Charity testified that she was upset and angry when she continued to receive calls from NetCredit after her bankruptcy filing, although she did not answer most of the calls or they were received by her husband. She wondered whether her attorneys were properly representing

her and whether the Chapter 13 trustee was making payments as she had been told he would.

Mrs. Charity discovered the post-bankruptcy debits of her credit union account by checking her account online.  She borrowed money from her husband in order to prevent checks she had written from bouncing.[19]  She had to call other creditors to seek delays in payment and on at least one occasion placed a stop payment to prevent further debits from NetCredit.  Her fear that NetCredit would continue to make withdrawals prompted her to close her credit union account, relying upon the advice of counsel.

On May 18, 2016, Mrs. Charity and Jennifer Williams, a representative of NetCredit who works in Enova's call center, spoke by telephone.  At that time, Ms. Williams asked Mrs. Charity for the name and telephone number of her bankruptcy attorney, verified Ms. Charity's email address and demanded proof of Mrs. Charity's bankruptcy filing within seven business days before NetCredit would cease collection action.  This conversation further confused Mrs. Charity because she had understood that creditor action would cease automatically.  NetCredit's demands caused her to again question whether her attorneys were properly advising her.

---

[19] The Joint Stipulations submitted in this case state that NetCredit debited "the Debtors' bank, Hampton Roads Educators' Credit Union" suggesting that the account which was debited was a joint account of Mr. and Mrs. Charity; however, Mrs. Charity's testimony, in which she consistently referred to the account as "my account," along with testimony that she borrowed money from Mr. Charity to replenish the account so as to avoid overdrafts, establishes that Mr. Charity did not share an interest in that account.  In his testimony, Mr. Charity acknowledged that it was his wife's account that had been debited.  As a result, Mr. Charity was not directly impacted by the account debits.

Mrs. Charity testified that NetCredit's actions affected her work performance,[20] created tension and loss of sleep, made her short tempered and adversely affected her relationship with her husband and daughter. After NetCredit ceased collection activities, she testified that these problems largely disappeared.

Mr. Charity's testimony corroborated that the decision to file bankruptcy stemmed from his work-related injury. He recalled Mrs. Charity asking him for money to cover shortfalls resulting from NetCredit's debit of her credit union account. He confirmed that NetCredit continued to call their home phone following the bankruptcy filing but stated that he avoided answering most of the calls or would just hang up the phone.

Mr. Charity stated that Mrs. Charity's attitude and spirit were negatively impacted by NetCredit's actions, which adversely affected her interactions with their children. Their marital relationship and sex life were also negatively affected. Mr. Charity testified that Mrs. Charity's stress was manifested in physical ways, such as developing knots and wrinkles in her face and other changes to her appearance "even to the point that she had hair falling out of her head."[21] He added that in their forty years of marriage, he had never seen her so dispirited.

---

[20] Once again, it appears unlikely that Mrs. Charity's work-related symptoms were caused by the postpetition actions of NetCredit, since Mrs. Charity had retired before she filed her bankruptcy case.
[21] Tr. 144:22.

Joseph Banks' prior testimony in the Lane case was incorporated into the record of the Charity case by agreement.  In supplemental testimony, Mr. Banks added that the automatic stay violations in this case occurred because Dansler Dover failed to properly follow Enova's business practices related to bankruptcy.  He also testified that NetCredit's collection calls to customers are computer-generated.  A record is kept of the call, including the date and time, and all calls are recorded.  The system is designed to terminate telephone calls automatically once a bankruptcy case is opened.  He further testified that once Mrs. Charity informed Ms. Williams of her bankruptcy, Ms. Williams should have "open[ed] a case and utilize[d] the proper scripting."[22]

Mr. Banks testified that the May 18, 2015, email with the subject line "Bankruptcy Documentation Received" was sent to Mrs. Charity by Ms. Williams after their telephone conversation. Ms. Williams chose the text of this email from an "email bank" contained on the Wiki.  The email informed Mrs. Charity that after NetCredit confirmed her bankruptcy no further collection activity would take place. Mr. Banks stated that Ms. Williams chose the incorrect email from the email bank and should have sent an email stating that Mrs. Charity had informed NetCredit of her bankruptcy instead of stating that NetCredit had received documentation of the bankruptcy.[23]

---

[22] Tr. 163:11-12.

[23] "It's just that in this email it starts off: 'We have received documentation related to your bankruptcy filing.' And . . . Ms. Charity didn't send us documentation; she called. So I'm saying that Jennifer Williams sent the wrong email. It's purely schematics (sic). . . . She just sent the wrong email. She went -- she -- so there's a list of emails for bankruptcy. Instead of

*Collin Edmonds and Bobbie Lane Edmond (Adv. Pro. No. 16-03122-KLP)*

Stipulated Evidence

The parties stipulated to the following:[24]

On March 28, 2016, Bobbie Lane Edmonds borrowed $3,000.00 from NetCredit and subsequently commenced paying NetCredit by allowing it to electronically withdraw semi-monthly payments from her bank account. On May 20, 2016, Mr. and Mrs. Edmonds filed a Chapter 13 bankruptcy case. NetCredit received the Notice of Bankruptcy from the Bankruptcy Notice [sic] Center on May 25, 2016.

On May 31 and June 15, 2016, NetCredit sent emails to Mrs. Edmonds thanking her for her recent payments. On June 20 and June 28, 2016, NetCredit sent emails to Mrs. Edmonds with the subject line "Friendly Reminder regarding your NetCredit account," notifying her that her account was past due and that she should make a payment.

On July 5, 2016, NetCredit sent Mrs. Edmonds an email with the subject line "Important Information about your NetCredit account." The email notified Mrs. Edmonds that her

---

sending an email that merely says you have contacted us and informed us you filed bankruptcy, she sent an email that says we have received documentation." Tr. 159:8-12,19-24.

[24] The stipulated facts are not a verbatim reproduction of the parties' stipulation filed with the court but rather a summary of the relevant stipulated facts.

account was unpaid and that her failure to pay might adversely affect her credit standing.

Between June 18 and July 6, 2016, NetCredit's records reflect that it made fifteen telephone calls to Mrs. Edmonds' cell phone and fourteen calls to Mrs. Edmonds' work phone. The call records indicate that most calls were not answered. On most occasions, including all of the calls to Mrs. Edmonds' work phone, messages were left.

On May 31, 2016, NetCredit withdrew $132.69 from Mrs. Edmonds' bank account through a regularly scheduled ACH Authorization.[25] On that same day, Mrs. Edmonds incurred an overdraft fee of $144.00 as a result of the ACH debit.

The Edmondses' amended complaint against NetCredit was filed on June 30 and served on NetCredit on July 5, 2016. NetCredit, through its counsel, returned $132.69 to the Edmondses on July 22, 2016.

<u>Evidence Presented at Trial</u>

The Edmondses[26] filed bankruptcy because they had gotten behind on their mortgage after paying for a new furnace. They also had IRS debt and "lots of credit cards."[27] Another creditor had attached her bank account.

---

[25] Mr. Edmonds' testimony establishes that the bank account debited by NetCredit was owned solely by Mrs. Edmonds. Tr. 188:19-21.
[26] Mrs. Edmonds is the mother of Plaintiff Mekeanna Lane.
[27] Tr. 174:8-19.

They were receiving numerous calls from creditors.  They understood that filing bankruptcy would allow them to pay what they could afford, stop the calls from creditors and relieve them from the stress they were under.

Mrs. Edmonds routinely checks her bank account status each morning. On May 31, 2016, she discovered that her account was overdrawn by $544.00 and that NetCredit had debited her account $132.69.  She found this very upsetting because she had thought that filing bankruptcy would prevent something like this from happening.  Part of the overdraft was $144.00 that was charged in bank fees as a result of the NetCredit debit.  She was unable to deposit sufficient funds to bring her account current, and her bank subsequently closed the account.

On June 15, 2016, Mrs. Edmonds received an email from NetCredit thanking her for an ACH payment of $132.69.  Mrs. Edmonds was aware that her bank account did not have funds available for this debit and assumed it would add to her overdraft.

A few days later, Mrs. Edmonds began receiving collection calls from NetCredit at home and at work.  The calls at work were particularly disruptive and affected her disposition.  The phone calls were also upsetting to Mr. Edmonds, though he usually reported them to Mrs. Edmonds and didn't answer them himself.

Before trial, Mrs. Edmonds started working in a new department with her employer.  She took two days off from work to attend the trial in this adversary proceeding, which made her nervous about how her new

supervisors would perceive her work habits.  She works five days a week and makes $63,000.00 annually.

Joseph Banks' prior testimony in the Lane case was incorporated into the record of the Edmonds case by agreement.  In supplemental testimony, Mr. Banks testified that the postpetition collection calls and ACH debits took place because the bankruptcy representative for NetCredit, Dansler Dover, did not follow business practices related to NetCredit's bankruptcy process. He acknowledged that NetCredit had attempted, without success, to debit Mrs. Edmonds' bank account on June 15, 2016.  In order to "fix" NetCredit's mistakes, the funds improperly debited from Mrs. Edmonds' account were returned to her and Mr. Dover was terminated from his employment.  Mr. Banks also initiated "quality-assurance checks related to NetCredit and bankruptcy."[28]  In connection with the quality-assurance check, Mr. Banks did not verify how many cases Mr. Dover mishandled nor did he investigate how many times NetCredit engaged in improper postpetition conduct with a debtor who had declared bankruptcy.

A couple of months before Mr. Dover's mishandling of the Charity bankruptcy, Mr. Banks had discussed Mr. Dover's job performance with him. He had additional conversations with Mr. Dover after receiving the complaint in the Charity case.  Mr. Banks had thought his conversations with Mr. Dover about the importance of not violating the automatic stay were adequate steps to address Mr. Dover's performance problems at that time.

---

[28] Tr. 194:20-25; 195:1-2.

## Conclusions of Law

The parties agree that in each of the three cases before the Court NetCredit willfully violated the automatic stay.[29]  As stipulated by the parties, the only issues here are to what extent the Court should award damages.

The remedies for willful violations of the automatic stay are set forth in § 362(k)(1) of the Bankruptcy Code.  That section provides generally that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  An award of actual damages is mandatory.  *Ojiegbe v. Walter (In re Ojiegbe)*, 539 B.R. 474, 479 (Bankr. D. Md. 2015).[30]  The burden is on the debtor to establish damages by a preponderance of the evidence, and the award "must be

---

[29] Each case includes this stipulation. "The parties stipulate that NetCredit violated the automatic stay in 11 U.S.C. § 362 by contacting the Debtors more than once and by withdrawing money from the Debtors' bank account after NetCredit received notice of the Debtors' bankruptcy.  NetCredit had knowledge the automatic stay was in effect and failed to stop its collection communications and ACH withdraws which had the effect of violating the stay."

   In order to establish that a violation was willful, a creditor "need not act with specific intent but must only commit an intentional act with knowledge of the automatic stay.  See *Budget Service*, 804 F.2d at 292–93; *In re Atl. Business & Community Corp.*, 901 F.2d 325, 329 (3d Cir. 1990)."  *Citizens Bk. of Md. v. Strumpf (In re Strumpf)*, 37 F.3d 155, 159 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 16 (1995).  The above stipulation establishes that NetCredit had knowledge of the automatic stay and thereafter deliberately continued collection action.  Though the word "willful" is not specifically included in the stipulation, NetCredit's acceptance of the stipulation is tantamount to admitting that its violations of the stay were "willful."  *See Scott v. Wells Fargo Home Mortg., Inc.*, 326 F.Supp.2d 709, 718 (E.D. Va. 2003) ("Willful conduct refers to deliberateness of conduct and knowledge of bankruptcy filing, not to specific intent to violate court order.").

[30]  "The award of actual damages is mandatory upon a finding of a willful violation of § 362." *Ojiegbe v. Walter (In re Ojiegbe)*, 539 B.R. 474, 479 (Bankr. D. Md. 2015) (quoting *In re Clayton*, 235 B.R. 801, 810 (Bankr. M.D.N.C. 1998)).

founded on concrete, non-speculative evidence." *Id. (*quoting *In re Seaton,*

462 B.R. 582, 595 (Bankr. E.D. Va. 2011)).[31]

*Compensatory Damages*

Actual damages include those actually incurred by the debtor.

*Skillforce, Inc. v. Hafer,* 509 B.R. 523, 534 (E.D. Va. 2014).  Actual losses may

include lost time damages, out-of-pocket expenses and emotional damages.

*In re Ojiegbe*, 539 B.R. at 479.

Although emotional distress is generally included as an available

component of "actual damages" under § 362(k),[32] courts are divided over

when it is appropriate to award emotional distress damages.  This Court, in

*In re The Original Barefoot Floors of America, Inc.,* 412 B.R. 769, 776-77

(Bankr. E.D. Va. 2008) and more recently in *In re Seaton,* 462 B.R. 582, 600-

603 (Bankr. E.D. Va. 2011), after noting the absence of definitive precedent in

the Fourth Circuit, examined cases decided by other circuit courts and the

decisions of other courts within the Fourth Circuit before concluding that

damages for emotional distress may be allowed under § 362(k)(1).

---

[31]*See also Warren v. Dill (In re Warren)*, 532 B.R. 655, 660-61 (Bankr. D.S.C. 2015) (reviewing the split of opinion regarding the burden of proof to apply in an action for willful violation of the automatic stay and concluding that the majority of courts have adopted the preponderance of the evidence standard).

[32] In *Lansaw v. Zokaites (In re Lansaw),* 853 F.3d 657, 664-68 (3d Cir. 2017), the Third Circuit recently held that damages for emotional distress are available under § 362(k), joining the First , Ninth and Eleventh Circuits, which it noted have expressly ruled that damages for emotional distress may be recovered under § 362(k), citing *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1271 (11th Cir. 2014); *Dawson v. Wash. Mut. Bank, F.A. (In re Dawson)*, 390 F.3d 1139, 1148 (9th Cir. 2004), *abrogation on other grounds recognized* in *Gugliuzza v. FTC (In re Gugliuzza)*, 852 F.3d 884, 896 (9th Cir. 2017); *Fleet Mortg. Grp., Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir. 1999).  The court in *Lansaw* further noted that the 5th and 7th Circuits have not ruled out the possibility that such damages may be recoverable under certain circumstances, citing *Young v. Repine (In re Repine)*, 536 F.3d 512, 522 (5th Cir. 2008); *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 880 (7th Cir. 2001).

In *Seaton*, Judge St. John found that a number of courts, recognizing that emotional damages may be more easily manufactured than other types of damages, have held that emotional damage awards under § 362(k) must be supported by "specific information" rather than "generalized assertions."  462 B.R. at 601 (citing *Young v. Repine (In re Repine),* 536 F.3d 512, 521-22 (5th Cir. 2008); *Fleet Mortg. Grp., Inc. v. Kaneb,* 196 F.3d 265, 270 (1st Cir.1999)).[33]  Judge St. John held that the appropriate standard is that genuine emotional distress damages should be compensable, even in the absence of related financial loss, but only if the debtor can clearly establish that he suffered a significant harm and demonstrates a causal connection between the significant harm and the actions taken in violation of the stay.  462 B.R. at 603.[34]  This standard has been adopted by other circuits and is the standard that should be applied in the instant cases.[35]

---

[33] At least one circuit court has held that emotional injury is not compensable unless it can be linked to a causally related financial injury.  *See Aiello v. Providian Fin. Corp.*, 239 F.3d at 880.

[34] In *In re Seaton,* 462 B.R. 582, 602 (Bankr. E.D. Va. 2011), Judge St. John quoted *Page Ventures, LLC v. Ventura–Linenko (In re Ventura–Linenko)*, No. 3:10–cv–138–RCJ–RAM, 2011 WL 1304464, at *9 (D. Nev. Apr. 1, 2011) ("Fleeting or trivial anxiety or distress does not suffice to support an award; instead, an individual must suffer significant emotional harm. An individual must establish that he or she was injured by the violation to be eligible to claim actual damages.") (internal citation omitted).

[35] *See Lodge v. Kondaur Capital Corp.*, 750 F.3d at 1271 (The Eleventh Circuit opined that "we join other circuits in concluding that emotional distress damages fall within the broad term of 'actual damages' in § 362(k).  We share, however, the Fifth, Seventh, and Ninth Circuits' caution that not every willful violation of the stay merits compensation for emotional distress and that a standard governing such claims is necessary.  We thus hold that, at a minimum, to recover 'actual' damages for emotional distress under § 362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay.").  The Court takes note of Judge Lee's decision in *Erhart v. Fina, (In re Fina)*, No. 1:12-cv-660 (GBL-TCB), 2012 WL 12870343 (E.D. Va. Nov. 14, 2012), *aff'd sub nom. Bradley v. Fina (In re Fina)*, 550 F. App'x 150 (4th Cir. 2014), finding that while emotional distress damages are generally not recoverable in

<u>Mekeanna Lane's Compensatory Damages</u>

After Ms. Lane's bankruptcy filing, NetCredit withdrew $83.94 from her bank account on two separate occasions. All of the improperly withdrawn funds, totaling $167.88, were returned to Ms. Lane by NetCredit prior to the trial in this case.

Ms. Lane established that she missed seven hours of work due to NetCredit's improper actions. She makes $28.92 per hour. Accordingly, Ms. Lane's actual damages include $202.44 in lost income. Ms. Lane presented no other evidence of financial loss associated with NetCredit's actions. She claimed no other out of pocket expenses.

Ms. Lane's claim for damages for emotional distress is primarily based on the embarrassment and guilt she claims to have suffered by having to borrow money from her mother after NetCredit debited her bank account. NetCredit's improper postpetition communications and the improper withdrawals caused her to feel confused and angry. Ms. Lane also testified that it was necessary to increase her hours at work in order to make up for her financial loss and that her increased time at work left her unable to devote as much time to her nine year old son as she would have liked.

Applying the standard set forth in *Seaton* for an award of emotional distress damages, the Court finds that Ms. Lane has failed to establish that she suffered significant emotional harm as a result of NetCredit's actions.

---

civil contempt proceedings, such damages may be recovered in connection with automatic say violations provided the standards set forth in *Seaton* are met.

Her assertions of emotional distress were vague, generalized, and otherwise
not established with any degree of specificity.[36]

Ms. Lane's claim that her relationship with her son suffered due to
NetCredit's actions is based on her assertion that debiting her bank account a
total of $167.88, an amount that she was able to borrow from her mother and
that was subsequently returned by NetCredit, required her to work extra
hours and spend less time with her son.  The Court does not find this claim of
distress to be credible.  Ms. Lane acknowledged that she had already been
working overtime in an effort to avoid a bankruptcy filing.  The additional
hours worked after her bankruptcy filing that could be attributable to
NetCredit's automatic stay violations would have been relatively

---

[36] In *Seaton*, 462 B.R. at 603-04, Judge St. John offered some guidance as to how an
individual may establish that he or she suffered significant emotional harm, quoting with
approval the following language from *Page Ventures, LLC v. Ventura–Linenko*, 2011 WL
1304464, at *9:

> A person may establish that he or she suffered significant emotional harm
> in several ways.  First, the person could offer corroborating medical
> evidence.  Second, non-experts, such as family members, friends, or
> coworkers may testify to manifestations of mental anguish.  Third, if the
> violator engaged in egregious conduct, the significant emotional distress
> may be readily apparent without corroborative evidence.  To illustrate, a
> creditor engaged in egregious conduct when he entered the debtor's home
> at night, doused the lights, and pretended to hold a gun to the debtor's
> head.  Fourth, even if the conduct is not egregious, the circumstances may
> make it obvious that a reasonable person would suffer significant
> emotional harm.  To illustrate, a debtor suffered emotional harm when she
> was forced to cancel her son's birthday party because her checking account
> had been frozen.

Judge St. John found the plaintiffs' claims of emotional distress in *Seaton* to be "problematic"
and "disproportionate" to the acts committed by the creditor.  462 B.R. at 603.  Likewise, the
evidence presented by Ms. Lane falls short of establishing significant mental anguish
resulting from NetCredit's automatic stay violations.  Ms. Lane's testimony regarding the
embarrassment occasioned by having to borrow money from her mother was neither credible
nor convincing.  The Court notes that her mother is Bobbie Lane Edmonds, a plaintiff in one
of these associated cases who filed her bankruptcy one week before Ms. Lane and whose bank
account was also improperly debited by NetCredit.

inconsequential.[37]  More importantly, Ms. Lane again presented no evidence

of specific harm to her relationship with her son but instead offered only

generalized assertions.

Ms. Lane incurred actual compensatory damages in the amount of

$202.44 resulting from lost income.  She has not met her burden of

establishing by a preponderance of the evidence that she is entitled to

damages for emotional distress.

### James and Regina Charity's Compensatory Damages

NetCredit withdrew $175.22 from Mrs. Charity's credit union account

on two occasions, once on April 29, 2016, and again on May 18, 2016, after

Mr. and Mrs. Charity filed bankruptcy.  On July 22, 2016, NetCredit

returned $350.44 to Mr. and Mrs. Charity.  Therefore, at the time of trial, all

funds improperly withdrawn had been returned.

Mrs. Charity incurred two overdraft fees of $30.00 each, along with a

stop payment fee of $25.00, that were caused by NetCredit's improper

withdrawals from her credit union account.  Those charges, totaling $85.00,

were not reimbursed by NetCredit.  Mr. and Mrs. Charity drove a total of 132

miles to attend the trial.[38]  There is no evidence that Mr. and Mrs. Charity

incurred any other financial losses as a result of NetCredit's stay violations.

---

[37] Ms. Lane was already working overtime prior to her bankruptcy filing because she was
behind on her mortgage payments, credit cards and automobile payments.  Tr. 22-23.  The
impact on her ability to spend time with her son could not have been significantly affected by
the temporary loss of $167.88 when her rate of pay was $28.92 per hour.
[38] Although no evidence of actual costs incurred for transportation was offered, the Court
takes judicial notice that the standard mileage rates for business, medical and moving

NetCredit's post-bankruptcy collection calls and credit union account withdrawals caused Mrs. Charity to suffer inconvenience, confusion, stress, disappointment, and anger.  She was required to borrow money from her husband in order to replenish her credit union account and contend with other creditors whose payments were delayed.  It became necessary to place a stop payment on her credit union account in order to prevent future unauthorized withdrawals.

The effect that NetCredit's continuing collection activities had on Mrs. Charity went beyond the normal stress and frustration that would ordinarily be associated with dealing with a creditor that fails to readily comply with a bankruptcy stay.  In this case, NetCredit's actions caused an emotional harm that was manifested by changes in Mrs. Charity's behavior and physical appearance.  Mr. Charity testified that there was a change in Mrs. Charity's attitude and spirit that he had not previously seen during their forty years of marriage.  He stated that her demeanor and appearance changed "even to the point that she had hair falling out of her head."  The evidence clearly establishes that Mrs. Charity incurred some degree of significant emotional harm as a result NetCredit's stay violations.

Despite Mr. Charity's unchallenged testimony, the extent of Mrs. Charity's emotional distress is difficult to ascertain.  Without corroborating medical evidence or circumstances that would make the reasonable likelihood

---

recognized by the Internal Revenue Service for 2017 is 53.5 cents per mile.  IR-2016-169, December 13, 2016.

of significant emotional harm obvious, it is difficult to distinguish the harm

caused by a violation of the automatic stay from other sources of stress

typically experienced by many debtors in bankruptcy.[39]  In Mrs. Charity's

case, her questionable contention that NetCredit's stay violations led to work-

related stress and had adverse effects on her employment creates some

uncertainty regarding the sources of her emotional distress.  Mrs. Charity

testified that she was employed as a teacher at Surry County High School

and that the collection calls, some of which came to her in the classroom and

others through the school office, were very embarrassing and frustrating.

Her testimony was that these workplace calls contributed to the emotional

distress she claims to have suffered due to NetCredit's stay violations.  The

record is clear, however, that Mrs. Charity retired from teaching on July 1,

2015, which was more than nine months before her bankruptcy filing.

Therefore, the embarrassing calls to her place of employment must have

occurred before she filed bankruptcy.  Moreover, as she and Mr. Charity

acknowledged, their bankruptcy filing was intended to provide relief from

stressful creditor calls and foreclosure proceedings.  It is therefore reasonable

to conclude that some degree of Mrs. Charity's emotional distress was derived

from sources other than the stay violations.  Mrs. Charity's association of

---

[39] "Segregating the emotional distress experienced by a debtor from the automatic stay
violation from other stress sources may be problematic."  *In re Seaton*, 462 B.R. at 602.  The
court in *Seaton* thus observed that "[t]his leads the Court to ponder whether the extent of the
Seatons' distress was not proximately caused by the removal and disposal of some items of
their personality but, rather, represents the cumulative stress caused by Mr. Seaton's injury,
his unemployment, their son's diagnosis of illness, their bankruptcy filing, and the
embarrassment of their ouster from the Apartment, none of which is causally related to any
stay violation here."  *Id.* at 603.

NetCredit's pre-bankruptcy workplace calls to her emotional damages claim bears this out.

Although the Court concludes that Mrs. Charity has established by a preponderance of the evidence that she clearly suffered significant emotional harm, it can award only those actual damages proximately caused by NetCredit's stay violations.[40]  In this case, as in *Seaton*, the amount of damages should be proportionate to the actions of NetCredit that took place after Mrs. Charity's bankruptcy filing.[41]  Accordingly, the Court will award damages for emotional distress to Mrs. Charity in the amount of $1,000.00.

Although the Amended Complaint includes Mr. Charity as a plaintiff and seeks actual damages on his behalf, it is clear that the debt to NetCredit was owed solely by Mrs. Charity, NetCredit's post-bankruptcy collection actions were directed only at Mrs. Charity, and the improper withdrawal of funds were from a credit union account owned solely by Mrs. Charity.[42]  Furthermore, Mr. Charity offered no evidence of actual damages on his own behalf.[43]  Mr. Charity has failed to meet his burden of proving by a

---

[40] *See In re Seaton*, 462 B.R. at 603.

[41] *Id.*

[42] The allegations in the Amended Complaint (Adv. Pro. No.16-03121-KLP, ECF Doc. No. 5) and its prayer for relief are premised largely on the erroneous contentions that (1) NetCredit wrongfully debited funds from a bank account owned jointly by Mr. and Mrs. Charity when, in fact, the bank account from which funds were debited was owned solely by Mrs. Charity, and (2) NetCredit's claim is against both debtors when the debt is, in fact, owed solely by Mrs. Charity.  Paragraphs 23-24 of the Joint Stipulation of Uncontroverted Facts (Adv. Pro. No.16-03121-KLP, ECF Doc. No. 32) are based on the same erroneous predicates.  To the extent that the stipulations differ from the Court's findings of fact, they are rejected.

[43] Mr. Charity's testimony was largely confined to the effect that NetCredit's actions had on his wife.  He offered no evidence that he personally suffered any financial or emotional damages.  To the extent that he fielded any post-bankruptcy collection calls to Mrs. Charity, he "just hung up."

preponderance of the evidence that he incurred any actual damages.  He is not entitled to an award for actual damages.

Mrs. Charity has established by a preponderance of the evidence that she has incurred actual damages in the amount of $1,155.63, representing $85.00 in unreimbursed credit union charges, $70.63 in travel expenses[44] and $1,000.00 for emotional distress.  Accordingly, she is entitled to actual compensatory damages in the amount of $1,155.63.

<u>Collin and Bobbie Lane Edmonds' Compensatory Damages</u>

Mr. and Mrs. Edmonds filed a joint Chapter 13 bankruptcy on May 20, 2016.  After receiving the Notice of Bankruptcy, NetCredit withdrew $132.69 from Mrs. Edmonds' bank account.  She was charged an overdraft fee of $144.000 as a result of NetCredit's withdrawal.  NetCredit subsequently returned $132.69 to Mrs. Edmonds.  She has not been reimbursed for her overdraft fee.

Mrs. Edmonds testified that she used two vacation days in order to appear at trial.  She is a salaried employee, making $63,800.00 annually.  She drove fifteen miles each way to attend trial, which took place over one day.

Much of the testimony at trial centered on the distress suffered by Mrs. Edmonds upon discovering that her bank account was overdrawn by $544.00 after NetCredit withdrew $132.69 on May 31, 2016.  Mrs. Edmonds testified that it was "very emotional" for her.  Mr. Edmonds described it as upsetting.

---

[44] 132 miles at 53.5 cents per mile.  *See infra* note 38.

NetCredit also placed numerous postpetition collection calls to Mrs. Edmonds, both to her cell phone and to her workplace.  Mrs. Edmonds was not particularly disturbed by the calls directed to her cell phone but felt harassed by the calls to her work phone; nevertheless, her only indication of any associated emotional harm was her testimony that it affected her in how she "carried herself" at work.  Mr. Edmonds described the calls as upsetting to both himself and his wife, although he did not answer the calls.

Other than the overdraft fee of $144.00 and the expenses associated with attending the trial, Mrs. Edmonds presented evidence of no other unreimbursed expenses as a consequence of NetCredit's actions.  Mr. Edmonds presented no evidence of financial loss.

Mrs. Edmonds' claim for damages for emotional distress due to NetCredit's stay violations fails on two accounts.  First is her failure to demonstrate that she suffered significant harm.  Mrs. Edmonds presented only generalized assertions that NetCredit's actions were upsetting. Although one might argue that the numerous phone calls placed to her place of employment were egregious, Mrs. Edmonds' general assertions that the calls distracted her and affected how she carried herself at work do not support a determination that NetCredit's actions were so egregious as to have caused her significant emotional harm.

Second, Mrs. Edmonds has failed to demonstrate that the overdraft of her bank account, which she described as a "very emotional" episode, was proximately caused by NetCredit's stay violation.  NetCredit debited the sum

of $132.69 and, as a consequence, her bank charged an overdraft fee of $144.00, for a total reduction in her account of $276.69. Mrs. Edmonds testified, however, that her account was overdrawn by $544.00. It follows that the overdraft did not occur solely as a result of NetCredit's actions but would have occurred, albeit to a lesser extent, even if NetCredit had not made the withdrawal.

Mrs. Edmonds incurred actual compensatory damages in the total amount of $415.25, resulting from bank overdraft charges in the amount of $144.00, lost income in the amount of $255.20[45] and $16.05[46] in travel expenses. She has not met her burden of establishing by a preponderance of the evidence that she is entitled to damages for emotional distress.

Mr. Edmonds' claim suffers from the same deficiencies as that brought by Mr. Charity. The debt to NetCredit was owed solely by Mrs. Edmonds, the bank account that was debited was owned solely by Mrs. Edmonds, and the post-bankruptcy collection activities were directed only at Mrs. Edmonds. Mr. Edmonds has failed to meet his burden of proving by a preponderance of the evidence that he incurred any actual damages. He is not entitled to an award for actual damages.

---

[45] Although there is no direct evidence of Mrs. Edmond's hourly rate of pay, the Court calculated her rate of pay to be $31.90 per hour on the basis of her annual salary and calculated her lost income on the basis of missing eight hours (one full day) of work. *See Skillforce, Inc. v. Hafer*, 509 B.R. 523, 534 (E.D. Va. 2014) ("[A]ssuming a 40-hour work week and 50 work weeks per year, an annual income of $73,000 amounts to hourly earnings of $36.50."). Although Mrs. Edmonds testified that she arranged to take two days of vacation to attend trial, the trial was completed in one day.
[46] Calculated at the rate of 53.5 cents per mile for a 30 mile round trip.

*Punitive Damages*

Section 362(k)(1) of the Bankruptcy Code provides that an individual injured by a willful violation of the stay may, in "appropriate circumstances," recover punitive damages.[47]  At least one Plaintiff in each of the three adversary proceedings was injured by NetCredit's willful violation of the automatic stay.  Accordingly, the Court must determine whether the circumstances are appropriate for an award of punitive damages.

The term "appropriate circumstances" is not defined in § 362.  In *Green Tree Servicing, LLC, v. Taylor (In re Taylor)*, 369 B.R. 282, 289 (S.D. W.Va. 2007), Judge Copenhaver, after noting the lack of uniform guidance on what is meant by "appropriate circumstances," listed several standards that courts have adopted.  Some courts have awarded punitive damages after determining that the creditor acted in "arrogant defiance of federal law." *Id.*[48]  Other courts have considered four factors: (1) the nature of the defendant's conduct, (2) the defendant's ability to pay, (3) the motives of the defendant, and (4) any provocation by the debtor.  *Id.*[49]  In *Seaton*, Chief Judge St. John indicated that punitive damages would be appropriate if the

---

[47] The "good faith belief" exception set forth in § 362(k)(2) is inapplicable to this case.
[48] Citing *In re Curtis*, 322 B.R. 470, 486 (Bankr. D. Mass. 2005); *In re Pawlowicz*, 337 B.R. 640, 648 (Bankr. N.D. Ohio 2005); *In the Matter of Mullarkey,* 81 B.R. 280, 284 (Bankr. D.N.J. 1987).
[49] Citing *Heghmann v. Indorf (In re Heghmann),* 316 B.R. 395, 405 (B.A.P. 1st Cir. 2004) (citing *In re Sumpter,* 171 B.R. 835, 845 (Bankr. N.D. Ill. 1994)); *In re B. Cohen & Sons Caterers, Inc.,* 108 B.R. 482, 487–88 (E.D. Pa. 1989).  *See also Rawles v. Wych (In re Rawles)*, No. 08-00555, 2009 WL 2924005 at *2 (Bankr. D. Md. June 18, 2009).

court were to find egregious or vindictive conduct "resembling a specific intent" to violate the stay.[50]

Applying any of these standards, it is appropriate to award punitive damages in these cases. NetCredit is an institutional creditor that has not only repeatedly violated the automatic stay in cases involving multiple debtors in clear disregard of the provisions of the Bankruptcy Code, but it has given no indication that it will discontinue doing so.

NetCredit designated Joseph Banks to be its sole representative to appear and testify on NetCredit's behalf. His testimony essentially constitutes the entirety of NetCredit's defense.

Mr. Banks, Enova's bankruptcy manager, oversees a team of four individuals, each individual having sole responsibility for managing all of the bankruptcy accounts of a particular Enova subsidiary. One of those individuals is solely responsible for managing all of the bankruptcy accounts for NetCredit, an online lender wholly owned by Enova. Mr. Banks estimated that the individual assigned to NetCredit is responsible for close to ten thousand bankruptcy accounts.

When the violations occurred in these cases, the individual responsible for managing NetCredit's bankruptcy accounts was Dansler Dover. Mr. Dover's responsibilities included processing bankruptcy notices, preparing

---

[50] *In re Seaton*, 462 B.R. at 604 (quoting *Rountree v. Nunnery (In re Rountree)*, 448 B.R. 389, 419 (Bankr. E.D.Va. 2011)).

and filing proofs of claim and handling all telephone calls from customers who filed bankruptcy.

NetCredit's bankruptcy processes are managed by a computer based application known as a Wiki, and NetCredit's acts and omissions are totally dependent on the efficacy of the application and its appropriate implementation by the bankruptcy representative.  If either the application or the individual utilizing it is deficient, then the processes for managing bankruptcy accounts will be compromised.  The evidence in these cases is that both the Wiki and Mr. Dover's performance were deficient.

Mr. Banks testified that Mr. Dover's employment was terminated because he did not follow the business practices that were included on the Wiki.  Before the stay violations took place in these cases, Mr. Banks had found it necessary to have discussions with Mr. Dover regarding his poor job performance; however, he took no remedial actions other than to point out Dover's mistakes.[51]  Mr. Banks further testified that he commenced "quality-assurance checks for NetCredit bankruptcy to mitigate risk and assure that this doesn't occur again."[52]  On cross examination, however, he admitted that the quality assurance program was not implemented until after months after

---

[51] Mr. Banks:  "I let him know what he was supposed to be doing.  I asked him why wasn't he doing what he is supposed to be doing.  So I did everything that I was supposed to on my end. So correcting, the only thing I could correct other than doing his job for him would be sitting next to him and watching him do his job, and we all know as leaders, as managers, that's not efficient.  There's no way I could do his job for him and hold his hand.  He was put in the position, as any other adult is, to function in his role day to day, and that's what I expected of him."
Question:  "But you never took any steps to find out how many other people he harmed."
Mr. Banks:  "No."
Tr. 198:18-199:7.
[52] Tr. 156:10-12.

he was made aware of these stay violations and only after litigation had been commenced.[53]  Upon being pressed further, Mr. Banks also acknowledged that the department charged with implementing the quality assurance program would not be responsible for revising the system-generated correspondence that routinely results in stay violations.[54]  After hearing Mr. Banks' testimony, the Court is of the opinion that the "quality assurance program" was designed primarily to create the erroneous perception for purposes of this litigation that NetCredit has taken significant steps to prevent future stay violations.

Mr. Banks' testimony demonstrates that NetCredit's bankruptcy department is understaffed, undertrained, and inadequately supervised.  It also establishes that NetCredit has not implemented appropriate measures to address these inadequacies or the deficiencies inherent in the application utilized to manage its bankruptcy cases.  His testimony concerning the routine practice whereby, in response to receiving a bankruptcy notice and terminating an ACH Authorization, NetCredit generates correspondence advising the bankrupt customer that "cancellation of your electronic authorization does not relieve you of your obligation to repay your loan, and that all payments are still due on your scheduled installment dates" is particularly telling:

---

[53] Tr. 161:16-21; 164:1-19.
[54] Tr. 166:6-8.

Question:   If I remember right, you testified that NetCredit had some purpose for sending this email but that the purpose was not to collect a debt?

Banks:  Right.

Question:   If you got this email, would you think this email was an attempt to collect a debt?
. . .

Banks:  Are you asking me personally?  If I received this email and I were in bankruptcy, I would not think that this email was an attempt to collect a debt, because I would know that I was in bankruptcy and that I shouldn't pay on this debt.  So no.

Question:  Do you think the words of this email, by their words, show an attempt to collect a debt?

Banks:  Again, no.  If I were in bankruptcy, I would not think that this email was an attempt to collect a debt, because I would know that I was in bankruptcy and that I shouldn't pay on this debt.  So, no.

Question:  When you mentioned what changes have been made at NetCredit because of this case, have any changes been made in the text of this email that goes out whenever ACH is cancelled for a client who has declared bankruptcy?

Banks:  No.

Question:  What would it take to get changes made in this email?

Banks:  So, that's a bit of a technology process.  It's an exhaustive process.  It would take drafting a new email, it would take our dev (sic) team to initiate the new email, it would take dev work to initiate the process to review the automations.  So, it - - would take a process.

Question:  Have you started that process?

Banks:  No.[55]

Mr. Banks' testimony establishes that NetCredit's system is designed so that every customer, including those in bankruptcy, whose ACH Authorization is terminated receives correspondence demanding future payment.  Even if Mr. Dover had properly employed the software application, a stay violation was inherently designed to take place.[56]  Moreover, NetCredit has not taken steps to initiate the process necessary to prevent future stay violations because it would be "an exhaustive process."

It is difficult to comprehend how Mr. Banks, the individual in charge of managing all of the bankruptcy accounts for Enova and its subsidiaries, would fail to recognize that sending correspondence to a customer who has filed bankruptcy stating that "all payments are still due on your scheduled installment dates" is not an "act to collect . . . or recover a claim against the debtor that arose before commencement of the case."[57]  It is even more baffling that Mr. Banks would continue to display this fundamental misunderstanding throughout the trial of these cases.  Yet, it is evident that Mr. Banks remains of the opinion that there is no flaw in NetCredit's bankruptcy related procedures.  And if Mr. Banks, who is in charge of

---

[55] Tr. 66:9-67:8.

[56] Noncompliance with the automatic stay is not excusable whether fault lies with an automated system that has been put in place or with the employee charged with operating it. *Associated Credit Servs., Inc.* (*In re Campion*), 294 B.R. 313, 317 (B.A.P. 9th Cir. 2003) ("We perceive no difference as a practical matter between a computer program that does not perform tasks accurately and a clerical employee who does not perform tasks accurately. In either event, the employer bears the risk of the consequences.").

[57] 11 U.S.C. § 362(a)(6).

supervising Enova's bankruptcy team,[58] lacks a basic understanding of the

prohibitions associated with the automatic stay, then one may infer that his

lack of understanding permeates these entities.[59]

The Court finds that NetCredit, as an institution, either does not fully

grasp or refuses to acknowledge the importance and purpose of the automatic

stay.[60]  The Court further finds that NetCredit presently has no intention of

implementing the changes necessary to prevent future violations.  Such

conduct constitutes a reckless disregard of NetCredit's statutory duties in

arrogant defiance of federal law.

The Agreements executed by the Plaintiffs in these cases and attached

as Exhibit A to each Joint Stipulation of Uncontroverted Facts contain

identical provisions authorizing the lender to electronically debit installment

payments from the borrowers' bank accounts.  It is logical to conclude that

many, if not most, of NetCredit's customers have likewise agreed to ACH

Authorizations in order to make installment payments.  Since NetCredit has

approximately ten thousand customers who have filed bankruptcy,[61] it

---

[58] Mr. Banks testified that he has been at Enova for ten years and has served as bankruptcy manager for six years.  Before he was bankruptcy manager, he was a quality assurance analyst whose responsibility was to make sure that Enova's representatives were following compliance rules and regulations.  Tr. 52-54.

[59] Mr. Banks testified that CashNetUSA, another subsidiary of Enova, employs the same processes related to the automatic stay as does NetCredit.  Tr. 68:3-12.

[60] "The automatic stay is a bedrock principle upon which the Code is built; the importance of § 362 cannot be over-emphasized."  *In re Garner*, No. 09-81998, 2010 WL 890406, at *2 (Bankr. M.D.N.C. Mar. 9, 2010) (unreported decision) (citing *Grady v. A.H. Robins Co.*, 839 F.2d 198, 200 (4th Cir. 1988)).  The Court finds that NetCredit, as a sophisticated creditor, is aware of the statutory obligations associated with the automatic stay in bankruptcy but has chosen to disregard them.

[61] Mr. Banks testified as follows:

follows that there likely are thousands of customers whose bankruptcies have

triggered a termination of automatic withdrawals and who would have

received correspondence from NetCredit informing them that despite their

bankruptcy filings they remain obligated to make their installment

payments.

NetCredit's failure to employ and properly train an adequate number

of employees to manage its accounts in bankruptcy, coupled with its

unwillingness to contribute the resources necessary to correctly deploy the

software applications utilized in its bankruptcy processes, suggests that

NetCredit's business model favors concentrating its resources on originating

loans and collecting payments on active accounts while devoting minimal

resources to borrowers who have filed bankruptcy.[62]  Even if this is not an

---

THE COURT: And do you know how many bankrupt  account --
bankruptcy accounts NETCREDIT would have –
THE WITNESS: It would be --
THE COURT: -- at any one time?
THE WITNESS: -- again, approaching probably tens of  thousands of
customers, if, you know -- yeah, probably close to that.
THE COURT: Tens of thousands of customers of
NETCREDIT who have filed bankruptcy?
THE WITNESS: Yeah. So, it could be in the high single thousands,
approaching tens of thousands of customers, something like that.
THE COURT: All right, so, it could be roughly --
THE WITNESS: 5- to 10,000 customers.
THE COURT: -- 10,000, give or take, bankruptcy customers?
THE WITNESS: Yes, customers --
THE COURT: And --
THE WITNESS: -- in bankruptcy.
Tr. 106:24-107:17.
CashNetUSA, being a larger subsidiary, would likely also have thousands of customers that
have filed bankruptcy.
[62] The Agreements executed by the debtors in these cases provide for annual percentage
rates approaching 100% per annum.  The unsecured status and high interest rates reflected
in these loans indicates that NetCredit's customer base is comprised primarily of higher risk
borrowers with a relatively greater risk of default.  Mr. Banks testified that preparing and
filing proofs of claim is not a priority.  Tr. 98:21-22.  This further suggests that NetCredit

accurate assessment of its business plan, it is evident that NetCredit's

attention to its customers who have filed bankruptcy is wholly inadequate.

The Court is not bound by specific statue or precedent when

determining the amount of punitive damages to award under § 362(k)(1).

"Although the Supreme Court has emphasized that punitive damage awards

violate due process when they constitute an arbitrary deprivation of property,

the Court has repeatedly 'decline[d] . . . to impose a bright-line ratio which a

punitive damages award cannot exceed.'" *Saunders v. Equifax Info. Servs.,*

*L.L.C.,* 469 F.Supp.2d 343, 348 (E.D. Va. 2007), *aff'd sub nom. Saunders v.*

*Branch Banking & Trust Co. of Va.,* 526 F.3d 142 (4th Cir. 2008) quoting

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).  S*ee*

*also Cisson v. C.R. Bard, Inc. (In re C.R. Bard, Inc.)*, 810 F.3d 913, 931 (4th

Cir. 2016).[63]  Unlike compensatory damages, which address a party's

"concrete loss," punitive damages aim at "deterrence and retribution."

*Saunders,* 469 F.Supp.2d at 348, quoting *State Farm Mut. Auto. Ins. Co. v.*

*Campbell,* 538 U.S. 408, 416 (2003).

The Supreme Court has identified "three guideposts" that a lower

court should consider when evaluating punitive damages awards: (1) the

degree of reprehensibility of the defendant's misconduct, (2) the disparity

---

intentionally devotes minimal resources to its bankruptcy accounts in favor of maximizing its
return on accounts not in bankruptcy.

[63] A defendant must be given adequate notice of a claim for punitive damages.  *See Philip
Morris USA v. Williams*, 549 U.S. 346 (2007).  Here, NetCredit was made aware of the
Plaintiffs' intentions to seek significant punitive damages from the inception of these cases
and throughout the proceedings.  NetCredit knew after conceding that it had committed
violations of the automatic stay that the trial would be confined to determining the damage
awards.

between the actual or potential harm suffered and the punitive damages

award (the ratio between punitive and compensatory damages), and (3) the

difference between the punitive damages awarded and civil penalties

authorized or awarded in comparable cases. *State Farm*, 538 U.S. at 418;

*accord Cisson v. C.R. Bard, Inc.*, 810 F.3d at 931; *Saunders*, 469 F.Supp.2d at

350.[64]  In short, a punitive damages award "must be based on the facts and

circumstances of the defendant's misconduct" and the punishment must be

"reasonable and proportionate to the amount of harm caused." *Saunders,* 469

F.Supp.2d at 350 (citing *State Farm*, 538 U.S. at 425-26).

The reprehensibility of a defendant's conduct, the first of the Supreme

court's guideposts, may be assessed by considering various factors including,

but not limited to, whether the conduct "evinced an indifference to or a

reckless disregard" for the rights of others, whether the target of the conduct

was financially vulnerable and whether the conduct involved repeated

actions. *State Farm,* 538 U.S. at 418 (citing *BMW of N. Am., Inc. v. Gore*, 517

U.S. 559 (1996)).[65]  In each of these cases, NetCredit's conduct showed a

---

[64] These "guideposts" are also considered in determining whether a defendant receives proper
notice of possible penalties. *May v. Nationstar Mortg., LLC*, 852 F.3d 806, 816 (8th Cir.
2017).

[65] Some of the other factors described in *State Farm's* reprehensibility analysis, such as
whether the misconduct involved physical harm or threats to the health and safety of others,
may have less relevance in the context of automatic stay violations. *See Saunders v. Branch
Banking & Trust Co. of Va.*, 526 F.3d 142, 152-53 (4th Cir. 2008), *aff'g Saunders v. Equifax
Info. Servs., L.L.C.*, 469 F.Supp.2d 343 (E.D. Va. 2007) ("FCRA violations result in economic
and emotional harm, but such violations will very infrequently cause physical harm or
endanger the health and safety of others.").  Nevertheless, "[t]he presence of just one
indicium of reprehensibility is sufficient to render conduct reprehensible and support an
award of punitive damages." *May v. Nationstar Mortg., LLC*, 852 F.3d at 816.  *See also
Saunders*, 526 F.3d at 153 ("The third factor [the 'financial vulnerability' of 'the target of the

reckless disregard of the rights of the Plaintiffs, targeted individuals who were financially vulnerable (debtors in bankruptcy) and involved repeated actions.[66] Therefore, under Fourth Circuit standards, NetCredit's conduct is "sufficiently reprehensible to justify an award of punitive damages." *Saunders*, 526 F.3d at 153.

The second guidepost involves the actual harm suffered by the Plaintiffs compared to the punitive damages award. Without including the Plaintiffs' attorneys' fees, this consideration would seem to favor a more modest punitive damages award in light of the relatively small compensatory damages awarded in these cases. Various courts, including the Fourth Circuit, have recognized, however, that the ratio of compensatory to punitive damages has less significance when the amount of compensatory damages is relatively small.

> Our sister circuits agree that when a jury only awards nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount "would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter." *Kemp v. Am. Tel. & Tel. Co.,* 393 F.3d 1354, 1364–65 (11th Cir. 2004) (allowing punitive damages award of $250,000 accompanying compensatory damages of $115.05); *see also Abner v. Kan. City S. R.R.,* 513 F.3d 154, 165 (5th Cir. 2008) (affirming punitive damages award of $125,000 accompanying nominal damages of $1); *Mathias v. Accor Econ. Lodging, Inc.,* 347 F.3d 672, 674–78 (7th Cir. 2003)

---

conduct'] is certainly present, and a single factor can provide justification for a substantial award of punitive damages.").

[66] NetCredit's unwillingness to implement the changes necessary to prevent future automatic stay violations portends that similar violations will continue. *See Saunders,* 526 F.3d at 153 (The defendant's "intentional misconduct and longstanding refusal to correct its errors are more reprehensible than negligence or a mistake quickly corrected."). *See also Bains LLC v. Arco Prods. Co.,* 405 F.3d 764, 775 (9th Cir. 2005) (reasoning that a company's failure to remedy or address the effects of a statutory violation supports a punitive damages award).

> (affirming $186,000 punitive damages award accompanying
> compensatory damages of $5,000); *Lee v. Edwards,* 101 F.3d 805, 811
> (2d Cir. 1996) (rejecting ratio analysis because "the compensatory
> award here was nominal, [so] *any* appreciable exemplary award would
> produce a ratio that would appear excessive by this measure"). Thus,
> we do not rely upon the challenged ratio to foreclose the punitive
> damages award here.

*Saunders*, 526 F.3d at 154.  Despite the small amount of compensatory

damages awarded in these cases, the award of punitive damages must be

significant enough to punish the violator and serve as a meaningful

deterrent.  *Id*.  Thus, a sum based on a modest multiple of the parties' actual

damages is insufficient.

The third guidepost requires an examination of amounts awarded in

comparable cases.  Penalties for automatic stay violations vary depending on

the circumstances and the parties involved; as such, there are few

opportunities for comparison.  There are, however, numerous cases in which

violations of the automatic stay have resulted in considerable punitive

damage awards.  *See, e.g.*, *Sundquist v. Bank of Am., N.A. (In re Sundquist)*,

566 B.R. 563 (Bankr. E.D. Cal. 2017), *appeal docketed*, No. EC-17-1103

(B.A.P. 1st Cir. Apr. 11, 2017) (awarding debtors $1,074,581.50 in actual

damages and $45,000,000.00 in punitive damages);[67] *In re Johnson*, No. 15-

50053, 2016 WL 659020 (Bankr. W.D.N.C. Feb. 17, 2016) (awarding debtors

$300 in actual damages for expenses in traveling to and from court, legal fees

of $3,297.23 and $54,000.00 in punitive damages, calculated at $100 per

---

[67] There are also counter-motions to alter or amend the judgment pending in the bankruptcy court.

phone call for 540 calls made to debtors over a six month period in violation of the automatic stay).

One of the primary purposes of awarding punitive damages for automatic stay violations is to deter future misconduct. *Saunders,* 526 F.3d at 152; *In re Johnson*, 2016 WL 659020 at *4 ("In determining the amount of a punitive damages award, the court is primarily concerned with changing the behavior that resulted in the stay violation, so the amount awarded should motivate the creditor to correct its conduct. Deterrence to others may be a relevant factor as well.") (internal citation omitted); *In re Riddick*, 231 B.R. 265, 269 (Bankr. N.D. Ohio 1999) ("[T]he primary purpose of punitive damages is to cause change in the [offending party's] behavior."). The amount of punitive damages assessed in these cases must be sufficient to motivate NetCredit to devote the resources necessary to correct the deficiencies in its bankruptcy procedures.

The Plaintiffs are seeking an award of punitive damages in the approximate amount of $600,000.00 in each of these cases.[68] The Plaintiffs argue that these awards would be appropriate given that Enova, NetCredit's parent company, has a net worth of $233,000,000.00.[69] The Court does not have reliable evidence that the value of NetCredit, as an independent entity, approaches that of its parent company;[70] however, the parent company's

---

[68] Tr. 215.

[69] Joseph Banks testified that Enova has a value of $233,000,000 but did not give a separate value for NetCredit. Tr. 133:24-25; 134:1-6.

[70] When Mr. Banks' testified as corporate designee of NetCredit during his deposition on December 21, 2016, he was unable to provide information regarding the net worth of

value reflects the existence of considerable worth in its subsidiaries.

NetCredit has tens of thousands, perhaps hundreds of thousands of

customers.[71]  While it is smaller than Enova's other subsidiaries, "its volume

kind of exploded in the last couple of years."[72]  Therefore, the Court has

sufficient information available to consider NetCredit's value as one factor in

determining punitive damages awards, particularly since awarding punitive

damages in these cases is intended to deter future misconduct.[73]

---

NetCredit.  ECF Doc. No. 59, deposition Tr. 134:7-9.  Despite NetCredit's failure to provide such information in response to discovery requests, the Plaintiffs took no action to compel its production.  No evidence of NetCredit's individual value was presented during the trials.  Instead, the Plaintiffs initially argued that the value of Enova should be attributed to NetCredit for purposes of determining the appropriate amount of punitive damages.  At the conclusion of the trials, the Court instructed NetCredit to submit evidence of its value.  On February 3, 2017, NetCredit provided affidavits from Enova's Chief Financial Officer, accompanied by an unaudited balance sheet and income statement, representing NetCredit's net worth as of December 31, 2016, to be $879,631 and its net income for the year ending on December 31, 2016, to be $39,764.  Adv. Pro. No. 16-03121, ECF Doc. No. 89.  The financial information provided by NetCredit has little probative value in itself because it contains almost no details.  The balance sheet and income statement show that NetCredit has no liabilities which, in turn, establishes that Enova's accounting methods do not routinely designate separate assets and liabilities for its subsidiaries.  In response to NetCredit's submission, the Plaintiffs point to publicly available materials concerning Enova's finances that the Plaintiffs contend cast doubt on the accuracy of the financial information provided by Enova's Chief Financial Officer.  The Plaintiffs now argue that NetCredit's net worth should be disregarded for purposes of determining the punitive damages awards.  *See* Plaintiffs' Supplemental Brief on Outstanding Issues, Adv. Pro. No.16-03121-KLP, ECF Doc. No. 94.  The Court has considered the net value of Enova, the substantial number of accounts owned and managed by NetCredit, and the financial information provided.  Taken together, they indicate that NetCredit has significant size and worth.  NetCredit's value and its ability to pay damages, however, is only one consideration in the Court's determination of the appropriate amounts to award in punitive damages.  *See Varela v. Ocasio (In re Ocasio)*, 272 B.R. 815, 825-26 (B.A.P. 1st Cir. 2002) (the inquiry should also take into account "the nature of the creditor's conduct, the nature and extent of harm to the debtor, the creditor's ability to pay damages, the level of sophistication of the creditor, the creditor's motives, and any provocation by the debtor.") (internal citation omitted).

[71] Tr. 106:17-23.

[72] Tr.110: 2-6.

[73] *See Achterberg v. Creditors Trade Ass'n (In re Achterberg)*, Adv. Proc. No. 15-9054, 2017 WL 473829 at *15 (Bankr. E.D. Cal. Feb. 3, 2017) (Debtors did not provide court with financial information; however, court determined that sufficient information had been provided to enable the court to determine appropriate punitive damages, including evidence that the creditor maintained "ongoing business operations of significant economic size.").

The Court does not consider NetCredit's value to be a reason to consider reducing the punitive damages awards.  NetCredit chose not to introduce reliable evidence of its net worth and, therefore, failed to meet its burden to do so.[74]

NetCredit's conduct is sufficiently reprehensible to impose punitive damages awards in each of these cases, and its size and sophistication suggest that a substantial award is necessary to deter it from routinely engaging in future stay violations.  Nevertheless, the amounts sought by the Plaintiffs are too high.  The Court is of the opinion that the goals of punishment and deterrence may be achieved by a more measured response than that sought by the Plaintiffs, albeit one that not only properly addresses NetCredit's harm to the Plaintiffs but also recognizes its societal harm.

In recent years, courts, legislators, and commentators have questioned whether the traditional model of giving large punitive damage awards solely to a claimant who is already receiving compensatory damages properly serves the interests of justice.[75]  If the claimant is already being made whole by the compensatory award, many argue that it is appropriate to consider the extent to which societal interests are implicated and to allocate a portion of a

---

[74] "Under federal law, the Defendants - not Plaintiff - have the burden of introducing evidence of net worth for purposes of minimizing a punitive damages award."  *Morris v. Bland,* No. 5:12-cv-3177-RMG, 2014 WL 12637911, at *11 (D.S.C. Dec. 31, 2014).  *See also Kemezy v. Peters*, 79 F.3d 33, 34 (7th Cir. 1996) (adopting majority view that under federal law a plaintiff seeking punitive damages is not required to introduce evidence of the defendant's net worth).

[75] *See Sundquist v. Bank of Am., N.A. (In re Sundquist),* 566 B.R. 563, 614 n.107 (Bankr. E.D. Cal. 2017), *appeal docketed,* No. EC-17-1103 (B.A.P. 1st Cir. Apr. 11, 2017); *see also* Justin A. Reddington, *To Caesar What is Caesar's: An Audacious Claim for Punitive Damages Reform in Patent Law*, 10 Lib. U.L. Rev. 201 (2015).

punitive damages award to an entity that furthers those interests.

Otherwise, the claimant receives a windfall in the form of this societal

interest component.[76]

The dilemma involved in achieving the goal of awarding sufficient

punitive damages for automatic stay violations without simultaneously

providing an individual windfall was recently confronted by Judge Klein in

*Sundquist v. Bank of Am., N.A. (In re Sundquist)*, 566 B.R. 563 (Bankr. E.D.

Cal. 2017), appeal docketed, No. EC-17-1103 (B.A.P. 1st Cir. Apr. 11, 2017).

There, Judge Klein, after examining the judicial, legislative and scholarly

support for split recoveries of punitive damage awards, concluded "that

---

[76] In his dissent in *Smith v. Wade*, Chief Justice Rehnquist stated:

> [a] fundamental premise of our legal system is the notion that damages are
> awarded to *compensate* the victim—to redress the injuries that he or she
> *actually* has suffered. . . . [T]he doctrine of punitive damages permits the
> award of "damages" beyond even the most generous and expansive
> conception of actual injury to the plaintiff.

*Smith v. Wade*, 461 U.S. 30, 57-58 (1983) (internal citations omitted). *See also Sundquist*,
566 B.R. at 618 ("allowing the individual to pocket the societal interest component smacks of
too much of a windfall for the individual . . . [but] limiting punitive damages to an amount
that is not perceived as too big a windfall to stomach enables the wrongdoer to avoid paying
the societal component of punitive damages that are genuinely deserved.").

   At least one other court in this circuit has lamented the traditional means by which
punitive damages have been awarded.

> Finally, there is a feature of the punitive damages procedure which, if it does not
> render it constitutionally suspect, at least serves to make it morally wrong, and that
> is the fact that the proceeds of a punitive damages award go not into the public
> coffers as do all other fines and forfeitures but into the pockets of the successful
> plaintiff and his attorney.
> . . .
> And so, while this court could live very comfortably with a procedure which would
> allow tortfeasors in or out of the commercial world to be assessed punitive damages
> for wrongful conduct provided such damages when collected would inure to the
> benefit of the offended citizenry and not just the person who brought the action, the
> confused state of the law in the area of punitive damages and the reluctance of the
> courts to solve the problem by what this court considers the proper application of
> constitutional principles, insures that nothing is going to happen until Congress, the
> state legislatures, or both, step in and enact corrective legislation.

*Tudor Associates, Ltd., II v. AJ and AJ Servicing, Inc.,* 843 F.Supp. 68, 80 (E.D.N.C. 1993),
*aff'd in part and rev'd in part*, 36 F.3d 1094 (4th Cir. 1994).

§ 362(k)(1) permits a portion of punitive damages awarded to an individual injured by willful violation of the automatic stay to be channeled . . . to entities that serve the interests of preventing the willful violator's transgressions in the future." *Id*. at 618.

The decision in *Sundquist* to allocate a portion of the punitive damages award to entities serving societal interests was based, in part, on federal common law.[77] The court pointed to circuit court precedent in *Engquist v. Oregon Department of Agriculture*, 478 F.3d 985 (9th Cir. 2007), *aff'd on other grounds,* 553 U.S. 591 (2008), in which the Ninth Circuit struck down constitutional and common law challenges to Oregon's statutory allocation of a portion of a punitive damages award in a tort case to the Oregon Criminal Injuries Compensation Account.  478 F.3d at 999-1007.

Precedent similar to *Engquist* exists in the Fourth Circuit.  In *Cisson v. C.R. Bard* (*In re C.R. Bard, Inc.)*, 810 F.3d 913, 931 (4th Cir. 2016), the Fourth Circuit upheld a district court's ruling that a Georgia split-recovery statute directing that seventy-five percent of any punitive damages award resulting from a product liability judgment be paid to the state does not violate the Takings Clause of the Fifth Amendment.  *Id*. at 931-32.[78]  The

---

[77] More specifically, in *Sundquist* the court referred to "the 'common law evolution' rationale" (citing *Li v. Yellow Cab Co.*, 532 P.2d 1226, 1238-39 (Cal. 1975)) that permits judicial innovation such as that in *Dardinger v. Anthem Blue Cross & Blue Shield*, 781 N.E.2d 121, 144-45 (Ohio 2002), in which the Ohio Supreme Court found that common law permitted the court to redirect part of a punitive damages award to a public purpose linked to the defendant's misconduct.  566 B.R. at 615-16.

[78] In addition to finding that the Georgia statute does not violate the Takings Clause, the district court held that the statute does not violate the Equal Protection Clause of the

Fourth Circuit held, as did the district court from which the appeal arose, that the plaintiff failed to show that she has "a constitutionally protected property interest" in the punitive damages award. *Id.*, citing *Washlefske v. Winston*, 234 F.3d 179, 184 (4th Cir. 2000).[79]

Neither statutory dictate nor binding precedent mandates that punitive damages awarded under § 362(k)(1) may only be directed to the Plaintiffs in these cases. The amount of punitive damages required to redress the harm caused to the parties and serve the legitimate societal interests is greater than "what principles of fairness would justify" awarding solely to the Plaintiffs. *See Sundquist,* 566 B.R. at 614. Accordingly, this Court will adopt the conclusions and methodologies espoused in *Sundquist* and apply them to these cases.

After determining that § 362(k)(1) permits the court to channel a portion of a punitive damages award to public service organizations, Judge Klein addressed the appropriate allocation and determined that "[a] solution based on common sense is to direct to a public purpose the portion of legitimate punitive damages that exceed what private victims ought to be allowed to retain—the societal interest component of punitive damages."

---

Fourteenth Amendment. *Cisson v. C.R. Bard, Inc.*, No. 2:11-cv-00195, 2015 WL 251437, at *2-3 (S.D. W. Va. Jan. 20, 2015).

[79] The circuit court acknowledged the Ninth Circuit's decision in *Engquist* but stated that it did not need to apply that decision because the plaintiff in its case made "no claim that her right to punitive damages [arose] from the common law or [was] otherwise fundamental." 810 F.3d at 932. However, the district court, relying on *Engqui*st, had held that the plaintiffs held no property interest in the punitive damages award. *Cisson,* 2015 WL 251437, at *4 ("The only federal court to confront the issue of whether punitive awards qualify as property for purposes of the Takings Clause has agreed with this conclusion, largely relying on the contingent and discretionary nature of punitive damage awards.").

*Sundquist,* 566 B.R. at 616.  He further concluded that the public purpose should be aimed at redressing the underlying misconduct.  *Id.*

In *Sundquist*, the court noted the disadvantages consumers have in finding effective legal representation capable of competing with counsel typically representing sophisticated creditors and found that the societal component of the punitive damages award should be directed to entities focused on consumer law education and "leading public service consumer law organizations."  *Id.*  Similarly, NetCredit's conduct in these cases reflects the need to direct additional resources to financially distressed consumers who have limited means to defend themselves against aggressive creditors.[80]

NetCredit's actions have been equally egregious in each of these cases. Mekeanna Lane, Regina Charity and Bobbie Lane Edmonds will be awarded punitive damages pursuant to § 362(k)(1) in the amount of $100,000.00 each. Of the $100,000.00 that each is to receive, each of these Plaintiffs is enjoined to deliver $37,500.00 to the National Consumer Law Center and $37,500.00 to the Legal Services Corporation of Virginia[81]  (minus all taxes, if any, each plaintiff must pay on account of those sums).  There shall be a remittitur of the § 362(k)(1) punitive damages to $15,000.00 to each plaintiff if, and only to

---

[80] In *Sundquist,* the court observed that the circumstances in its case, which involved egregious violations of the automatic stay, encompassed issues of general consumer law and consumer bankruptcy law.  566 B.R. at 617.

[81] The National Consumer Law Center is a nonprofit, public interest organization that that promotes access to justice for low-income and other disadvantaged consumers including in the area of bankruptcy.  The Legal Services Corporation of Virginia (LSCV) provides grants to a statewide network of nonprofit organizations including nine regional legal aid programs and a statewide support center.  LSCV's purpose is to develop, fund, coordinate and oversee the delivery of civil legal services to the poor in Virginia.

the extent that, NetCredit contributes $37,500.00 to the National Consumer

Law Center and $37,500.00 to the Legal Services Corporation of Virginia on

account of each of these Plaintiffs.

### *Attorneys' Fees*

"[A]n individual injured by any willful violation of [the automatic] stay

*shall* recover actual damages, *including* costs and attorneys' fees . . . ."  11

U.S.C. § 362(k)(1) (emphasis added).  The plain language of the statute states

that attorneys' fees are actual damages under this section.  *Duby v. United*

*States (In re Duby)*, 451 B.R. 664, 674 (B.A.P. 1st Cir. 2011).  In order to be

recoverable, however, the attorneys' fees must be shown to be reasonable and

necessary.  *Skillforce, Inc. v. Hafer*, 509 B.R. at 534 (citing *In re Seaton*, 462

B.R. at 605).  Furthermore, "before the analysis of reasonableness and

necessity of claimed attorneys' fees even begins, a debtor must first

demonstrate, by a preponderance of the evidence, that she is *actually* liable

for the claimed fees."  *Skillforce* at 534.

The Plaintiffs in these cases are each represented by the same

attorneys.  These attorneys, on behalf of all of the Plaintiffs, submitted the

Application, which includes declarations and exhibits documenting hours

spent by the attorneys and their staff multiplied by their hour rates.  Along

with subsequent filings that include additional declarations and exhibits, the

Application constitutes the request for awards of attorneys' fees and expenses pursuant to § 362(k)(1).[82]

Counsel for the Plaintiffs contend that the Court should apply the "lodestar" method described in *Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, (2010), which is based on multiplying the reasonable number of hours spent by the attorneys and their employees by reasonable hourly rates, to determine what constitutes reasonable fees. "The Supreme Court has indulged a 'strong presumption' that the lodestar number represents a reasonable attorneys' fee. The Court recently explained that this presumption can only be overcome 'in those rare circumstances where the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee.'" *McAfee v. Boczar*, 738 F.3d 81, 89-90 (4th Cir. 2013), quoting *Perdue*, 559 U.S. at 542.

The Application sets forth a combined lodestar amount of $169,326.29.[83] A supplemental application (the "Supplemental Application") filed in each case increased this amount by $19,347.00 to $188,673.29. In the Supplemental Application, Plaintiffs' counsel seeks an upward enhancement

---

[82] The Application was filed in each of these adversary proceedings. Subsequently, a "Supplement to Consolidated Application by Counsel for Plaintiffs for Award of Attorney Fees and Reimbursement of Expenses" (the "Supplemental Application") that included documentation of additional fees incurred since the filing of the Application was filed in each case.

Finally, in each of the adversary proceedings, Plaintiffs filed a separate "Supplemental Brief on Outstanding Issues." Those supplemental briefs include documentation of additional fees incurred since the filing of the Supplemental Application and, for the first time, identify the portion of the fees attributable to each adversary proceeding.

[83] Initially, the Application stated that counsel had incurred $170,811.29 in fees. In subsequent filings, this amount was corrected to $169,326.29. In addition, the Application seeks reimbursement of $2,691.05 in expenses and costs.

of the lodestar amount of $188,673.29 by a multiple of 1.5 to $283,009.94 plus

reimbursement of expenses and costs in the amount of $2,691.05.

In each of the adversary proceedings, Plaintiffs also filed a separate

"Supplemental Brief on Outstanding Issues" (hereinafter referred to

respectively as the "Charity Supplemental Brief," the "Edmonds

Supplemental Brief" and the "Lane Supplemental Brief" and, collectively, as

the "Supplemental Briefs").  The Charity Supplemental Brief represents that

the "lodestar" attributable to the Charity case is $71,423.43.  The Edmonds

Supplemental Brief asserts a lodestar amount of $70,511.43 and the Lane

Supplemental Brief sets forth a lodestar of $69,471.93.  Their combined

amounts total $211,406.79.  Presumably, after their most recent supplement,

the Plaintiffs are seeking combined fees in the enhanced amount of

$317,110.19, which reflects a multiplier of 1.5 on the combined lodestar

amounts.

NetCredit objects to the Application, arguing that the Plaintiffs have

failed to demonstrate that they have incurred damages in the form of

attorneys' fees and that the amounts being sought are neither reasonable nor

necessary.  First, NetCredit asserts that the fees should be denied due to the

failure of Plaintiffs' counsel to comply with the rules applicable to retention

and disclosure of compensation.  Second, NetCredit maintains that if fees are

to be awarded, the amount of fees sought by Plaintiffs' counsel is excessive

and, were the Court to properly apply the lodestar method, the appropriate

fee amount would be $139,419.82.[84]  Finally, NetCredit contends that the

Plaintiffs should be denied their combined claim for reimbursement of costs

and expenses in the amount of $2,691.05 because the claim has not been

adequately substantiated.

Section 329(a) of the Bankruptcy Code provides that "[a]ny attorney

representing a debtor in a case under this title, or in connection with such a

case . . . shall file with the court a statement of the compensation paid or

agreed to be paid . . . ."  Bankruptcy Rule 2016(b) requires that the statement

be filed and transmitted to the U.S. Trustee within 14 days after the order for

relief or, where a supplemental statement is required, within 14 days after

any payment or agreement not previously disclosed.[85]  The phrase "in

connection with" has been broadly interpreted to include any services that

affect the bankruptcy estate.  *See In re Frye*, No. 15-10242, 2017 WL 1364973,

at * 6 (Bankr. D. Vt. Apr. 12, 2017); *In re Gorski*, 519 B.R. 67, 72 (Bankr.

S.D.N.Y. 2014) ("[I]f it can be objectively determined that the services

rendered or to be rendered by the attorney have or will have an impact on the

bankruptcy estate," then those services are considered to be "in connection

with" the bankruptcy case).[86]  An action based on a violation of the automatic

---

[84] This amount does not address the additional amounts subsequently requested in the
Supplemental Application and the Charity Supplemental Brief, Edmonds Supplemental
Brief and Lane Supplemental Brief.

[85] Rule 2016-1(B) of the Local Bankruptcy Rules for the United States Bankruptcy Court for
the Eastern District of Virginia (the "Local Bankruptcy Rules") requires each attorney
representing a debtor to file an Attorney's Disclosure Statement not later than 14 days after
the filing of a petition or the date that counsel is engaged.

[86] *See In re Hackney*, 347 B.R. 432, 442 (Bankr. M.D. Fla. 2006) (subsequently amended in
non-relevant part at No. 6:03-bk-02488-ABB, 2006 WL 3804678 (Bankr. M.D. Fla. Sept. 26,

stay "is at the heart of enforcement of bankruptcy law." *Sundquist*, 566 B.R.

at 596.  Each of these adversary proceedings involves a claim for damages for

automatic stay violations, and the outcome of each will have an effect its

bankruptcy estate.  Consequently, *all* of the attorneys representing the

debtors in these adversary proceedings are representing the debtors "in

connection with" their bankruptcy cases and are therefore required to comply

with Bankruptcy Rule 2016(b).  Furthermore, all fees sought by counsel are

subject to review, regardless of the source of payment.  *Burd v. Walters (In re

Walters)*, 868 F.2d 665, 668 (4th Cir. 1989) ("We are of [the] opinion that any

payment made to an attorney for representing a debtor in connection with a

bankruptcy proceeding is reviewable by the bankruptcy court

notwithstanding the source of payment.").

---

2006)) (" Both an objective review of the evidence in this matter and Counsel's own admission establish his services, whether he classified them as "bankruptcy" or "non-bankruptcy" services, had an impact on the bankruptcy. All of Counsel's services were in connection with the Debtors' bankruptcy case and the fees related to his services are subject to review.").

In these cases, counsel for the Plaintiffs acknowledges that their services will impact the bankruptcy estates.  The following statement is included in Plaintiffs' Supplemental Brief on Outstanding Issues in Adv. Pro. No. 16-03121-KLP, ECF. Doc. No. 94, p. 3:

> Plaintiffs' confirmed chapter 13 plan provides for a dividend of 100% to their general, unsecured creditors. Any significant punitive damages award would help to facilitate the successful completion of that plan. Because of this, any amount of a punitive damages award available to Plaintiffs, after taxes, would benefit both Plaintiffs and the general unsecured creditors who filed proofs of claim in Plaintiffs' case.

Plaintiffs' Supplemental Brief on Outstanding Issues in Adv. Pro. No. 16-03122-KLP, ECF. Doc. No. 93, p.3, and Plaintiff's Supplemental Brief on Outstanding Issues in Adv. Pro. No. 16-03150-KLP, ECF Doc. No. 84, p. 3, contain the following statement:

> Plaintiff[s] is [are] aware that any significant punitive damages award could be the subject of a trustee's motion for plan modification under 11 U.S.C. § 1329.  If such a motion were granted, Plaintiff[s] expects[s] that, after taxes are paid, the most immediate beneficiaries of a punitive damage award would be the general unsecured creditors who filed proofs of claim.  If that occurs, the amount of additional plan funding that would provide a 100% dividend to these general unsecured creditors is $15,367.42 [$13,413.44].

All of the Plaintiffs are represented by the same three law firms.[87]  On

March 2, 2017, a member of each law firm filed a substantially identical

document entitled "Disclosure of Compensation of Attorney for Plaintiffs in

Adversary Proceedings" in each of the three adversary proceedings (the

"Attorney Disclosures").[88]  The Attorney Disclosures generally conform to the

standardized Local Form 2030edva[89] that is acceptable for use in disclosing

the compensation of an attorney for a chapter 13 debtor in this District,

pursuant to § 329(a) and Bankruptcy Rule 2016(b).  Each of the Attorney

Disclosures provides that counsel has "agreed to accept the Lodestar amount,

calculated using my current hourly rate as of the date fees are awarded, plus

expenses."  Each of the Attorney Disclosures lists the source of compensation

paid or to be paid as "Other" and states "[f]ees to be paid by Defendants upon

approval by the Court."  Each Attorney Disclosure also provides that "[f]ees

approved by the Court will be shared on a pro rata basis, based upon the

respective attorneys' Lodestar amounts, between [the three law firms]."  Each

---

[87] Boleman Law Firm, P.C., Consumer Litigation Associates, P.C., and the Law Office of Dale W. Pittman, P.C.

[88] The Attorney Disclosures were filed only in the adversary proceedings and not in the underlying chapter 13 cases. (Adv. Pro. No. 16-03121-KLP, ECF Doc. Nos. 90, 91, 93; Adv. Pro. No. 16-03122-KLP, ECF Doc. Nos. 89, 90, 92; Adv. Pro. No. 16-03150-KLP, ECF Doc. Nos. 79, 80, 83).  The Boleman Law Firm, P.C., however, represents the Plaintiffs in their underlying bankruptcy cases and filed the appropriate disclosure in each of the Plaintiffs' cases contemporaneously with the filing of their chapter 13 bankruptcies.  In each case, the Boleman Law Firm elected to request compensation pursuant to Local Bankruptcy Rule 2016-1, which authorizes counsel to seek additional compensation in connection with representation in an adversary proceeding, to be computed on "a time and effort basis." Local Bankruptcy Rule 2016-1(C)(1)(a) and (C)(3)(a).

[89] Local Form 2030edva, as well as Local Form 2030R13edva used for chapter 13 cases filed in the Richmond Division of this Court, substantially conform to Director's Form B2030 issued by the Director of the Administrative Office of the United States Courts pursuant to Bankruptcy Rule 9009 for use in connection with the disclosure of compensation of an attorney for the debtor.

of the Attorney Disclosures also contains a certification that the representations therein are "an accurate statement of any agreement or arrangement for payment . . . for representation of the debtor(s) in this adversary proceeding." The proof of service attached to each Attorney Disclosure certifies that it was served on the debtor/plaintiff, the standing chapter 13 trustee and the U.S. Trustee. But for their untimeliness, the Attorney Disclosures appear to satisfy the requirements of § 329(a) and Bankruptcy Rule 2016(b).[90] The Attorney Disclosures establish that in each case the Plaintiffs have agreed to compensate their attorneys based on the "Lodestar" method (hourly rates multiplied by the reasonable number of hours expended), subject to approval by the Court.

Although the failure to timely or properly comply with the rules governing disclosure of compensation may justify the imposition of sanctions, including the denial of attorneys' fees,[91] it would not be appropriate to deny the Plaintiffs' claims for attorneys' fees in these cases due to the untimely filing of at least two of the Attorney Disclosures. First, just as reducing punitive damages solely to avoid a perceived windfall to the individual bringing the action would enable a wrongdoer to avoid paying the societal component of punitive damages, a denial of attorneys' fees based solely on the

---

[90]The applicable rules contemplate that the disclosures are to be filed in the underlying chapter 13 cases rather than solely in the adversary proceedings; however, the Attorney Disclosure was in each case served on the U.S. Trustee as required by Bankruptcy Rule 2016(b).

[91] *See In re Vernon-Williams*, 343 B.R. 766, 799 (Bankr. E.D. Va.), *aff'd in part and rev'd in part sub nom. Boleman Law Firm, P.C. v. U.S. Trustee*, 355 B.R. 548 (E.D. Va. 2006); *In re Hackney*, 347 B.R. at 443.

untimely filing of disclosures of compensation by Plaintiffs' counsel would

primarily benefit NetCredit, the wrongdoer in these cases.[92]  Second, the law

firm whose services comprise the majority of fees incurred timely filed Rule

2016(b) disclosures in each of the Plaintiffs' underlying chapter 13 cases that,

by reference to the Local Rules of this Court, indicated that fees for

representation in adversary proceedings would be determined on the basis of

time and expense.[93]  Finally, counsel for the Plaintiffs have indicated that

they will seek payment only to the extent that NetCredit is the source of their

compensation.[94]

A sanction for failure to comply with the disclosure requirements of

§ 329 and Rule 2016(b) "should be 'commensurate with the egregiousness of

the conduct' and will depend on the particular facts of each case."[95]  To the

extent that at least two of the law firms representing the Plaintiffs in these

cases failed to timely file their disclosures, their conduct was not egregious

and does not warrant the denial of their fees.  Consequently, the attorneys'

fees that are awarded to the Plaintiffs in these cases constitute fees actually

incurred by the Plaintiffs and are a component of actual damages recoverable

---

[92] *See Sundquist*, 566 B.R. at 618.  "In any event, [the creditor] is in no position to complain because its conduct necessitated the fees."  *Id.* at 595.

[93] In each chapter 13 case, the Boleman Law Firm, P.C. timely complied with LBR 2016-1(C)(1)(a) and (C)(3)(a)'s disclosure requirements.  These provisions authorize counsel to seek additional compensation in connection with representation in an adversary proceeding as determined on "a time and effort basis."  Local Bankruptcy Rule 2016-1(C)(3)(d).

[94] While this consideration may appear to address § 329 and Rule 2016(b) insofar as their purpose is to protect debtors from overreaching by their attorneys, it does not excuse the failure to comply with the mandates of these provisions. Moreover, it overlooks the reality that while the intended source of the fees to be paid to the attorney may be NetCredit, the contractual obligation to pay is that of the Plaintiffs.

[95] *Hackney*, 347 B.R. at 443, quoting *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 479-80 (6th Cir. 1996).

under § 362(k)(1).  *See Warren v. Dill (In re Warren)*, 532 B.R. 655, 664

(Bankr. D.S.C. 2015).

The Court must now consider the amount of attorneys' fees to be

awarded in each of these adversary proceedings.  Attorneys' fees are

recoverable under § 362(k)(1) only to the extent that they are reasonable and

necessary.  *Skillforce, Inc. v. Hafer*, 509 B.R. at 534 (citing *Seaton*, 462 B.R.

at 605).[96]  What constitutes "reasonable" attorneys' fees in the context of a

fee-shifting statue such as § 362(k)(1) was recently and thoroughly analyzed

by the Judge Davis of the Eastern District of Virginia in *Denton v. PennyMac

Loan Services, LLC,* Civil Action No. 4:16cv32, 2017 WL 2113138 (E.D. Va.

May 15, 2017).[97]  He instructed that the calculation of a reasonable attorney's

fee should begin with employing "the lodestar method by multiplying the

number of reasonable hours expended times a reasonable rate."  *Id*. at *3,

quoting *McAfee v. Boczar*, 738 F.3d at 88 (citation omitted).[98]  The lodestar

figure should then be evaluated under the twelve factors set forth in *Johnson

v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974).[99]  To

---

[96] "While there are a variety of ways to determine attorney's fees, the common denominator regarding fees in bankruptcy courts is that fees should not exceed the 'reasonable' value of services rendered. . . . The 'reasonable' value of services, of necessity, is determined on a case-by-case basis in light of the peculiar circumstances of each case, as modulated by the sound discretion of the bankruptcy court."  *Sundquis*t, 566 B.R. at 594 (citations omitted).
[97] In *Denton*, Judge Davis had before him a motion for attorneys' fees in connection with an action for violation of the Fair Credit Reporting Act.  *Denton v. PennyMac Loan Servs., LLC,* No. 4:16cv32, 2017 WL 2113138, at *1 (E.D. Va. May 15, 2017).
[98] *See also Warren v. Dill*, 532 B.R. at 664 (citing *Robinson v. Equifax Info. Servs.*, 560 F.3d 235, 243 (4th Cir. 2009) ("The Court determines the amount of reasonable attorney's fees to be awarded by applying the lodestar method: determining the number of hours reasonably spent on the case and multiplying that number by a reasonable hourly rate.").
[99] The twelve *Johnson* factors include:

the extent that these factors have already been included in the lodestar analysis, the lodestar figure is not adjusted by applying these factors again. 2017 WL 2113138, at *4 (citing *McAfee v. Boczar*, 738 F.3d at 91). The next step involves excluding fees related to unsuccessful claims that have no relationship to successful claims. *Id.* (citing *Robinson v. Equifax Info. Servs.*, 560 F.3d 235, 243 (4th Cir. 2009)). The final step requires the court to consider reducing the award if the relief obtained is limited compared to the overall scope of the litigation. *Id.* (citing *McAfee v. Boczar*, 738 F.3d at 92).[100]

According to the Plaintiffs, the combined lodestar for the three adversary proceedings is $211,406.79.[101] The Plaintiffs are seeking an enhanced combined amount of $317,110.19 in attorneys' fees, which reflects a multiplier of 1.5 on the combined lodestar amounts.

In each case, NetCredit has objected to the fees requested by the Plaintiffs (the "Fee Objection"),[102] contending that "the appropriate fee

---

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Denton*, 2017 WL 2113138, at *4.

[100] In *Seaton*, Judge St. John considered a factor similar to the final step described in *Denton*, stating that "[t]he proportionality of the attorney's fees sought to the damages incurred by a debtor is a significant factor in determining reasonableness." 462 B.R. at 605.

[101] *See supra* page 55.

[102] Adv. Pro. No. 16-03121-KLP, ECF Doc. No. 82, p. 13; Adv. Pro. No. 16-03122-KLP, ECF Doc. No. 80, p. 13; Adv. Pro. No. 16-03150-KLP, ECF Doc. No. 72, p. 13. NetCredit's analysis precedes the supplemental fee requests filed by the Plaintiffs.

amount is reduced to $139,419.82" when the lodestar analysis is calculated in accordance with Fourth Circuit precedent. Accompanying its Fee Objection is a detailed analysis of the time entries submitted by Plaintiffs' counsel in which NetCredit designates numerous charges as unnecessary, duplicative, inaccurate, or unrelated to the Plaintiffs and issues involved in these adversary proceedings.[103]  NetCredit objects to an enhancement of the lodestar, claiming that it is neither justified by the circumstances nor authorized by law.  NetCredit further argues that the award of attorneys' fees should be reduced because the amounts claimed are disproportionate to the damages incurred by the Plaintiffs.

Although NetCredit does not appear to object to a combined award of attorneys' fees and costs pursuant to a consolidated application, it is undisputed that these three adversary proceedings were neither substantively nor procedurally consolidated, the parties having agreed that the matters should be tried consecutively but separately.[104]  It is also a matter of record that at approximately the same time that these cases were filed, the attorneys representing these Plaintiffs filed nearly identical causes of action in this Court against NetCredit on behalf of two similarly situated

---

[103] *See* Exhibit 4 to Fee Objection.  NetCredit generally does not dispute the reasonableness of the hourly rates charged by Plaintiffs' counsel with the exception of one attorney whose rate NetCredit contends should be reduced by $25 per hour.  NetCredit's analysis includes the modest adjustment to this attorney's hourly rate.

[104] In connection with identical Motions in Limine filed in each case, the Court agreed to bifurcate the determination of appropriate fee awards from the trials of these cases and allow the claims for attorneys' fees to be presented at a combined hearing after the conclusion of the trials.  The orders granting the Motions did not consolidate the fee applications but merely provided that those applications would be heard at a later date.

clients.[105]  These two cases, along with a third case (collectively, the "Settled

Cases") filed by the attorneys representing the Plaintiffs, were scheduled to

be tried on the same dates that the Plaintiffs' cases were tried but were

settled prior to trial.[106]  Despite the fact that none of these six cases were

substantively or procedurally consolidated, counsel for the Plaintiffs, by their

own admission, failed to separately maintain contemporaneous time and

billing records for each case, instead electing to combine their timekeeping

records.  Although NetCredit does not object to a consolidated application, it

contends that some of the fees included in the Application are attributable to

services rendered to other clients including those involved in the Settled

Cases.

Although an analysis of the *Johnson* factors would ordinarily be the

next step in calculating a reasonable fee award, an in-depth analysis such as

that conducted by the court in *Denton* is not necessary in this case.  The

Court has reviewed the pleadings, exhibits, and declarations filed in

connection with the claims for attorneys' fees and finds little attention given

by any party to many of the twelve factors, save for the hourly rates, the

experience of the attorneys involved, and efforts to justify or dispute the need

---

[105] *Johnson v. NC Fin. Solutions of Utah, LLC*, Adv. Pro. No. 16-03152-KLP, and *Smith v. NC Fin. Solutions of Utah, LLC*, Adv. Pro. No.16-03144-KLP).

[106] Two additional substantially similar cases were subsequently filed by the same attorneys on behalf of other clients (*In re Munoz*, Case No. 16-32061 (Motion for Damages for Violation of the Automatic Stay, ECF Doc. No. 21) and *Fudala v. NC Fin. Solutions of Utah, LLC (In re Fudala)*, Adv. Pro. No. 16-03303), although the *Fudala* case was scheduled to be tried at a later date.  The *Johnson*, *Smith* and *Munoz* cases were also scheduled to be tried consecutively on the same dates that the instant cases were tried.

for the amount of time and attention expended.  For the most part, there is no dispute over the hourly rates of the attorneys.[107]

NetCredit's objection to the requested fee enhancement is well founded.  The Plaintiffs have cited no case where reasonable attorneys' fees were awarded as damages pursuant to § 362(k)(1) were increased by the use of a multiplier.  The Plaintiffs' reliance on the Fourth Circuit's decision in *Berry v. Schulman,* 807 F.3d 600 (4th Cir. 2015), *cert. denied*, 137 S. Ct. 77 (2016), is misplaced.  *Berry* involved a large class action settlement under the Fair Credit Reporting Act that involved years of litigation and a negotiated settlement that provided for a fee enhancement.  *Id.* at 617.[108]

Even if the Court does have the discretion to award an enhancement such as that being sought by the Plaintiffs, it would not elect to do so in these cases.  Although the Plaintiffs have called attention to NetCredit's improper business practices, there is no evidence that extraordinary results were obtained as a result of these cases.  In *Berry*, the "sea change" in the defendant's business practices referenced by the court was supported by expert testimony.  *Id.* at 618.  In contrast, the "sea change' in NetCredit's business practices the Plaintiffs claim to have produced is limited to quality assurance measures that the Court has found to be of dubious benefit.  The

---

[107] NetCredit asserts that one associate's hourly rate of $325-$350 should be adjusted downward by $25.  Although NetCredit has also questioned the increase of two other attorneys' hourly rate during the course of these proceedings ($475 per hour to $550 per hour, an increase of approximately 18% that legitimately could be questioned), it is not seeking an adjustment of these attorneys' rates.

[108] "[T]he fact that only one of the approximately 200 million members of the (b)(2) Class objects to the award of attorneys' fees is relevant to our decision."  *Berry v. Schulman,* 807 F.3d 600, 618 (4th Cir. 2015), *cert. denied,* 137 S. Ct. 77 (2016).

Plaintiffs' contention that there is "even more change . . . on the horizon" is speculative.[109]  There is no basis, either factual or legal, to award a fee enhancement.[110]

The Court also finds merit in other objections to the Application raised by NetCredit, particularly those occasioned by the failure of Plaintiff's counsel to maintain contemporaneous time records in each case.  It bears stating again that these cases were not consolidated for purposes of trial or otherwise.[111]  During the course of their representation of the Plaintiffs, these attorneys were representing other clients and comingling time entries for those clients' with time entries attributable to the Plaintiffs.  Numerous time entries refer to "cases" without sufficient information to determine whether the matter involves one or more of the Plaintiffs, one or more of the Settled Cases, or otherwise.  The explanations given by the attorneys concerning their method of allocating their time and billing among their clients vary; however, it is apparent that these allocations were made in hindsight and it is clear that anyone reviewing them, including their clients, would have no way of verifying their accuracy or reasonableness.

---

[109] Application, p. 11.

[110] Some of the documents submitted in connection with the Application indicate that at least one of the law firms representing the Plaintiffs contemplated a voluntary reduction of its fee request.  The Declaration of L. Lee Byrd attached to the Application states that the Boleman Law Firm is "self-discounting the actual charges by 10% [as] an appropriate exercise of billing judgment."  ¶ 6.  The Court is unable to discern, however, where such an adjustment has actually been applied.

[111] *Cf. Maddux v. Midland Credit Mgmt., Inc.,* 567 B.R. 489, 490-91 (Bankr. E.D. Va. 2016); (Pretrial Order, *Maddux v. Midland Credit Mgmt. Inc.,* Case No. 15–33574–KRH (Bankr. E.D. Va. July 14, 2016) (ECF Doc. No. 55).

In *Denton v. PennyMac Loan Services*, the district court commented on the inability of a court to evaluate the reasonableness of an attorneys' work when counsel has submitted insufficient documentation. "It is the obligation of counsel to 'maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.'" 2017 WL 2113138, at *13, quoting *Hensley v. Eckerhard*, 461 U.S. 424, 437 (1983).

This Court has made clear what it expects in connection with applications seeking supplemental compensation[112] in chapter 13 cases. *See In re Vernon-Williams*, 343 B.R. 766 (Bankr. E.D. Va. 2006), *aff'd in part and rev'd in part sub nom. Boleman Law Firm, P.C. v. U.S. Trustee*, 355 B.R. 548 (E.D. Va. 2006); *In re Hackney,* 347 B.R. 432, 442 (Bankr. M.D. Fla. 2006) (subsequently amended in non-relevant part at No. 6:03-bk-02488-ABB, 2006 WL 3804678 (Bankr. M.D. Fla. Sept. 26, 2006)). "[I]t is not overly burdensome to expect [a law firm] to keep contemporaneous and accurate time records for each individual case in which the firm seeks supplemental compensation; certainly, it is more practical to expect the applicant than the Court to justify fee Awards." *In re Vernon-Williams,* 343 B.R. at 797-98. We have also indicated our disapproval of the practice of "averaging out" client expenses because to do so "is unfair to the individual debtors and creditors, whose interests are case-specific." *Id*. at 806 (citing *In re Williams*, 102 B.R. 197, 199 (Bankr. N.D. Cal. 1989)) (holding with respect to a compensation

---

[112] Here, "supplemental compensation" refers to any amounts that exceed the "No-Look" Fee specified in Local Bankruptcy Rule 2016-1(C)(1)(a) and (C)(3)(a).

request by a trustee that "[a]s a matter of law, the Court finds that an expense is not 'actual,' and therefore not reimbursable under section 330(a)(2), to the extent that it is based on any sort of guesswork, formula, or pro rata allocation.").  The "averaging out" of fees attributable to more than one client is equally problematic.[113]

The lack of case-specific contemporaneous records is not the Court's only concern.  Another is that not all of the services for which counsel is seeking compensation are directly related to stay violations.  Each of the Plaintiffs' schedules listed a cause of action against NetCredit "arising" in connection with origination of the loans.  Time spent negotiating a recovery for claims that existed before their bankruptcy filings, even if NetCredit conditioned their resolution upon a potential settlement of the automatic stay violations, would not normally be recoverable as damages under § 362(k)(1).

The Applications also include charges for services rendered in connection with motions to compel discovery brought by the Plaintiffs in each case.  These motions sought the production of discovery related to the circumstances involved in making the loans rather than the stay violations.

---

[113] An attorney for one law firm has claimed that "trying to divide each task as it was performed into three parts was not always possible."  Supplemental Briefs, Second Supplemental Declaration of Mark C. Leffler in Support of Motion for Attorney's Fees, ¶6.  Most time entries, however, were not so insignificant nor do these difficulties excuse the failure to maintain separate accounts for each client.  As Judge St. John stated in *Vernon-Williams*, "[i]t is doubtless that practicing attorneys universally find no professional task more odious than the pain-staking maintenance of daily time records for their cases.  However dreadful and monotonous, contemporaneously maintained time records are quite simply where every attempt to value an attorneys' efforts begins . . . ." 343 B.R. at 798.  Just as any client is entitled to receive accurate and properly recorded details of the fees and expenses he or she has incurred, a court tasked with approving those amounts must insist upon the same.

The motions were denied.[114]  To the extent that fees related to these services were "spent on unsuccessful claims unrelated to successful ones" those amounts should be subtracted. *Denton v. PennyMac Loan Services*, 2017 WL 2113138, at *3, quoting *McAfee v. Boczar* 738 F.3d at 88. [115]

The Court also questions why it was necessary for the Plaintiffs to employ three separate law firms to pursue what would appear to be relatively straightforward complaints to recover damages for these automatic stay violations.  There is no indication that novel and difficult questions of law have been implicated.  *See Denton v. PennyMac Loan Services*, 2017 WL 2113138, at *9.  The employment of three separate law firms in each of the adversary proceedings raises concerns of over-lawyering.  A significant amount of travel time (two of the law firms' offices are located outside of Richmond) was included in the Application.  A substantial and questionable amount of time was spent on attorney conferences and communications. Multiple attorneys attended trial on behalf of the Plaintiffs.[116]  The explanations given by counsel regarding the individual roles of each attorney,

---

[114] Subsequent motions to compel brought by the Plaintiffs were denied on privilege grounds.
[115] At each trial, the Plaintiff(s) offered an exhibit (Exhibit 9 in Charity, Exhibit 6 in Edmonds and Exhibit 4 in Lane) purporting to show a pattern of NetCredit automatic stay violations.  In each case, NetCredit objected to its introduction based upon Rule 901 of the Federal Rules of Evidence.  The Court sustains NetCredit's objection on the grounds that the chart lacks sufficient authentication.
[116] Plaintiffs' counsel points to the Report and Recommendation of Magistrate Judge Lauck in *Randle v. H&P Capital, Inc.*, No. 3:09cv608, 2010 WL 2944907 (E.D. Va. July 21, 2010), *adopted in part* 2010 WL 3834862 (E.D. Va. Sept. 23, 2010), *aff'd in part and dismissed in part,* 513 F.App'x 282 (4th Cir. 2013), in which Judge Lauck indicated that so long as each lawyer is being compensated for a distinct contribution and are not unreasonably doing the same work, employing more than one lawyer in federal court litigation is not improper.  2010 WL 2944907, at *7.  The Court cannot help but notice, however, that NetCredit employed only one law firm and, to the Court's knowledge, only one attorney in the firm appeared in connection with these cases.

the steps taken to avoid duplication, and the representations that on occasion attorneys did not charge for their time do not adequately alleviate these concerns.

The Court in *Seaton,* when limiting its fee award, emphasized that the fees being sought were excessive in comparison to the Plaintiffs' damages. "The proportionality of the attorney's fees sought to the damages incurred by a debtor is a significant factor in determining reasonableness." 462 B.R. at 605. Concerns about proportionality are also reflected in the *Johnson* factor relating to the amount in controversy compared to the results obtained.

In each of these cases, NetCredit conceded that it violated the automatic stay, leaving the issues at trial confined primarily to the amount of damages to be awarded. The compensatory damages were relatively modest. Yet, the Plaintiffs incurred combined attorneys' fees in excess of $200,000, an amount that, even without a punitive damages award, would be strikingly disproportionate to the results obtained. The Court is aware that attorneys' fees will not always be directly proportionate to the amount of damages recovered and is mindful of the need to encourage the "vigorous enforcement" of statutes protecting individuals from offending creditors.[117] The Court also recognizes that the punitive damage awards in these cases temper the

---

[117] See *Denton*, 2017 WL 2113138, at *18, quoting *Croy v. E. Hall & Assocs., P.L.L.C.*, No. 5:06-CV-00107, 2007 WL 676698, at *3 (W.D. Va. 2007) ("requiring direct proportionality for attorneys fees would discourage vigorous enforcement of consumer protection statutes."). *See also In re Ojiegbe*, 539 B.R. at 483-84 ("As a Ninth Circuit bankruptcy judge pointedly asked '[w]hat good is it to be entitled to damages and attorneys' fees for a violation of the automatic stay if it costs a debtor much more in unrecoverable fees to recover such damages and recoverable attorneys fees?'") (quoting *Bertuccio v. Cal. State Contrs. License Bd. (In re Bertuccio)*, No. 04-56255, 2009 WL 3380605 at *7 (Bankr. N.D. Cal Oct. 15, 2009)).

disproportionality.  On balance, however, the fees incurred in comparison to

the amounts in controversy seem disproportionate and would warrant a

downward adjustment.[118]

The Court finds that acceptance of NetCredit's $139,419.82 "Proposed

Lodestar Calculation"[119] sufficiently alleviates these concerns.  No further

adjustment will be imposed to the fees requested in the Application.  In these

cases, it would be inappropriate to award attorneys' fees in an amount less

than what NetCredit has conceded in the Fee Objection to be the

"appropriate" fee amount.[120]  Thus, having carefully reviewed the

Application, along with the accompanying declarations and exhibits, the Fee

Objection and applicable law, the Court will award attorneys' fees in the

combined amount of $139,419.82, supplemented and apportioned as follows.

As previously noted, the Fee Objection does not account for the

additional attorneys' fees included in the Supplemental Application and the

Supplemental Briefs.  Therefore, the fee awards will be increased to the

extent the supplemental amounts requested are reasonable.

The Supplemental Application seeks additional attorneys' fees in the

combined amount of $19,347.00.  The Supplemental Briefs, for the first time,

---

[118] Having concluded that the fee award being sought in *Seaton* was "highly unreasonable," the court commented that the case "well-illustrates the concerns voiced by other courts of fostering a 'cottage industry' built around satellite fee litigation." 462 B.R at 605.
[119] Exhibit 3 to the Fee Objection.
[120] The Court does not accept NetCredit's contention that the hourly rate of Emily Kennedy should be reduced by $25.  To the extent that this reduction is factored into NetCredit's proposed lodestar amount, the Court will not correspondingly increase the award, because the increase is offset by the extraordinary increases in hourly rates charged by two attorneys while these cases were pending.  *See supra* note 107.

attribute separate "lodestar" amounts to each individual case.[121]

Unfortunately, even though Plaintiffs seek separate fees, the supporting

declarations and time submissions reflect a continued stubborn unwillingness

by counsel to attribute time entries to individual cases.  The explanations for

how counsel arrived at the final apportionment are as problematic as the

explanations given in the Application addressing the apportionment between

these cases and the Settled Cases.

It is unclear to what extent Plaintiffs, in the Supplemental Application

and Supplemental Briefs, seek an increase of fees over the fees previously

sought in the Application, since the amounts of the increases are not

specifically set forth.  However, by combining the amounts requested in the

Supplemental Briefs and subtracting from that total from the amount sought

in the Application,[122] the Court calculates a combined supplemental request

in the amount of $42,080.50.[123]

Having reviewed the Supplemental Application, the Supplemental

Briefs, and the objections filed by NetCredit, and applying the same rationale

---

[121] ECF Doc. No. 94 in Adv. Pro. No. 16-03121-KLP asserts that "[w]ith the supplemental time added, the initial lodestar attributable to the [Charitys] is $71,423.43.  ECF Doc. No. 93 in Adv. Pro. No.16-02122-KLP asserts a lodestar amount of $70,511.43 for the Edmondses, and ECF No. 84 in Adv. Pro. No. 16-03150-KLP asserts a lodestar amount of $69,471.93 for Ms. Lane.  Plaintiffs' counsel states that the separation of the amounts requested in "the three cases that were tried together" resulted in "additional work" requiring updates in the time submissions. The Court notes once again that these cases were not tried together.
[122] The corrected initial lodestar amount as stated in the Supplemental Application is $169,326.29 (calculated to be $168,606.44 by NetCredit, although NetCredit's asserted correction is included in its proposed fee).  The combined final request is $211,406.79.
[123] In its responses to the Supplemental Briefs, NetCredit itemizes the supplemental requests as $5,947.83 (Charity case), $6,467.16 (Lane case), and $6,467.16 (Edmonds case), for a total of $18,882.15.  It contends that the combined supplemental request should be allowed in the amount of $15,553.65, a reduction of $3,328.50.  However, the Court is unsure as to the basis of the figures cited by NetCredit.

as previously employed in accepting NetCredit's proposed fee reduction, the Court will award supplemental combined fees in the amount of $38,752.00.[124] This amount reflects NetCredit's proposed reduction of $3,328.50 to the supplemental fee request.

The combined total attorneys' fees award is thus $178,171.22, which represents $139,419.82 awarded pursuant to the Application and a $38,752.00 supplemental award. NetCredit's objections, to the extent not already sustained in arriving at this amount, will be overruled.

The Court is aware of no logical means to apportion the attorneys' fees award to the individual cases other than to prorate this amount on the basis of the amounts being sought by counsel in the individual cases. Accordingly, attorneys' fees in the amount of $60,195.05 will be awarded in Adv. Pro. No. 16-03121-KLP (Charity), $59,426.43 will be awarded in Adv. Pro. No. 16-03122-KLP (Edmonds) and $58,550.34 will be awarded in Adv. Pro. No. 16-03150-KLP (Lane).[125] Attorneys' fees shall not be payable by the Plaintiffs to counsel until those fees are received from NetCredit.

NetCredit asserts that the Plaintiffs should be denied their claim for reimbursement of costs and expenses in the amount of $2,691.05 because there are no itemized statements or invoices accompanying the claim. Adequate documentation is required before litigation costs may be awarded.

---

[124] *See Trimper v. City of Norfolk*, 58 F.3d 68, 77 (4th Cir. 1995) (time spent defending claim to attorneys' fees is compensable when party recovers attorneys' fees under fee-shifting statute) (internal citation omitted).

[125] These numbers are derived by multiplying the total requested fees in each case by the ratio of $178,171.82 (the total amount of fees awarded) to $211,402.79 (the total amount of fees originally sought by Plaintiffs).

*Trimper v. City of Norfolk*, 58 F.3d 68, 77 (4th Cir. 1995) ("an unverified

'Chart of Expenses,' with no receipts or bills attached" was insufficient

documentation to award costs); *Fernandes v. Montgomery Cty.*, No. SAG-10-

752, 2013 WL 6330705, at *7 (D. Md. Dec. 3, 2013) (merely listing litigation

expenses "[w]ith no supporting documentation, such as vouchers, or receipts,"

is insufficient to enable court to verify that the amounts are accurate and

reasonable). The Plaintiffs have provided only a combined listing of costs and

expenses with no supporting documentation. Therefore, they cannot be

allowed.

## Conclusion

### *Mekeanna Lane (Adv. Pro. No. 16-03150-KLP)*

Mekeanna Lane is awarded actual, compensatory damages in the

amount of $202.44. Ms. Lane is also awarded punitive damages in the

amount of $100,000.00. Of the $100,000.00 she is to receive, she is enjoined

to deliver $37,500.00 to the National Consumer Law Center and $37,500.00

to the Legal Services Corporation of Virginia (minus all taxes, if any, Ms.

Lane must pay on account of those sums). There shall be a remittitur of the

punitive damages to $15,000.00 to be fully retained by Ms. Lane if, and only

if, NetCredit contributes $37,500.00 to the National Consumer Law Center

and $37,500.00 to the Legal Services Corporation of Virginia on account of

Ms. Lane. Ms. Lane is also awarded $58,550.34 in attorneys' fees.

### *James and Regina Charity (Adv. Pro. No. 16-03121-KLP)*

Regina Charity is awarded actual, compensatory damages in the amount of $1,155.63.  Mrs. Charity is also awarded punitive damages in the amount of $100,000.00.  Of the $100,000.00 she is to receive, she is enjoined to deliver to the National Consumer Law Center and $37,500.00 to the Legal Services Corporation of Virginia (minus all taxes, if any, Mrs. Charity must pay on account of those sums).  There shall be a remittitur of the punitive damages to $15,000.00 to be fully retained by Mrs. Charity if, and only if, NetCredit contributes $37,500.00 to the National Consumer Law Center and $37,500.00 to the Legal Services Corporation on account of Mrs. Charity.  Mrs. Charity is also awarded $60,195.05 in attorneys' fees.

James Charity is not entitled to recover damages associated with NetCredit's violation of the automatic stay.  He shall not, however, be liable for attorneys' fees in connection with this adversary proceeding.

### *Collin and Bobbie Lane Edmonds (Adv. Pro. No. 16-03122-KLP)*

Bobbie Lane Edmonds is awarded actual, compensatory damages in the amount of $415.25.  Mrs. Edmonds is also awarded punitive damages in the amount of $100,000.00.  Of the $100,000.00 she is to receive, she is enjoined to deliver $37,500.00 to the National Consumer Law Center and $37,500.00 to the Legal Services Corporation of Virginia (minus all taxes, if any, Ms. Edmonds must pay on account of those sums).  There shall be a remittitur of the punitive damages to $15,000.00 to be fully retained by Mrs.

Edmonds if, and only if, NetCredit contributes $37,500.00 to the National Consumer Law Center and $37,500.00 to the Legal Services Corporation of Virginia on account of Mrs. Edmonds.  Mrs. Edmonds is also awarded $59,426.43 in attorneys' fees.

Collin Edmonds is not entitled to recover damages associated with NetCredit's violation of the automatic stay.  He shall not, however, be liable for attorneys' fees in connection with this adversary proceeding.

Separate orders will be entered.

Signed: August 14, 2017                     /s/ Keith L. Phillips
                                    United States Bankruptcy Judge

Copies:
                                    Entered on Docket:  Aug 15 2017

James Douglas Charity, Jr.
3660 Hog Island Road
Surry, VA 23883

Regina Parker Charity
3660 Hog Island Road
Surry, VA 23883

Collin Edmonds
8929 Hawkbill Rd.
Richmond, VA 23237

Bobbie Lane Edmonds
8929 Hawkbill Road
Richmond, VA 23237

Mekeanna Shindrell Lane
6225 Claudehart Road
Richmond, VA 23234

Thomas D. Domonoske
Consumer Litigation Associates
763 J. Clyde Morris Blvd, Suite 1-A
Newport News, VA 23601

Emily Connor Kennedy
Boleman Law Firm, P.C.
P.O. Box 11588
Richmond, VA 23230

Mark C. Leffler
Boleman Law Firm, P.C.
P.O. Box 11588
Richmond, VA 23230

Corey Simpson Booker
LeClairRyan, A Professional Corporation
SunTrust Plaza - 24th Floor
919 East Main Street
Richmond, VA 23219

Dale W. Pittman
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803